163 N.J. Super. 179 (1978)
394 A.2d 397
DONALD BROWN AND ANNETTE BROWN, PLAINTIFFS-APPELLANTS,
v.
JERSEY CENTRAL POWER AND LIGHT COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, GLEN L. MARTIN, CO., A CORPORATION OF THE STATE OF CALIFORNIA, G & W ELECTRIC SPECIALTY CO., A CORPORATION OF THE STATE OF ILLINOIS, AND S & C ELECTRIC CO., A CORPORATION OF THE STATE OF DELAWARE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 11, 1978.
Decided October 24, 1978.
*182 Before Judges CONFORD, PRESSLER and KING.
Mr. Thomas T. Warshaw argued the cause for appellants (Messrs. Drazin and Warshaw, attorneys; Mr. Michael T. Warshaw on the brief).
Mr. Robert E. McLeon argued the cause for respondent Glen L. Martin Co. (Messrs. Pillsbury & Russell, attorneys).
Mr. Thomas E. Primavera argued the cause for respondent Jersey Central Power and Light Co. (Messrs. Kirkpatrick & Rathman, attorneys).
Mr. Harry V. Osborne, II, argued the cause for respondent G & W Electric Specialty Co. (Messrs. Evans, Koelzer, Marriott & Osborne, attorneys).
Mr. Robert R. Witt argued the cause for respondent S & C Electric Co. (Messrs. Carton, Nary, Witt & Arvanitis, attorneys; Mr. Norbert T. Knapp, on the brief).
*183 The opinion of the court was delivered by KING, J.A.D.
Plaintiffs appeal from a summary judgment entered in favor of defendants dismissing plaintiffs' action for Donald Brown's personal injuries and the derivative claim of his wife, Annette Brown, based on theories of negligence and strict liability in tort. Hereinafter reference will be made to the injured plaintiff Donald Brown only (Brown).
The original complaint filed against Jersey Central Power and Light Company (Jersey Central) alleged that plaintiff Brown was injured as a result of negligence which caused an explosion at the Highland Air Force Base where he was engaged as a civilian employee electrician. Jersey Central supplied commercial power to the military installation. By amended complaint plaintiffs joined as additional defendants (1) Glen L. Martin Co. (Martin), a defense contractor, who allegedly participated in the design and construction of the facility where Brown was injured; (2) G & W Electric Specialty Co. (G & W) and (3) S & C Electric Company (S & C). The latter two defendants were electrical equipment manufacturers whom plaintiff claimed were involved in the installation, maintenance, or repair of the electrical equipment involved in the accident.
On July 30, 1971 plaintiff Brown was serving as a line-electrician in the Post Engineer's office at the base's diesel power plant. On that date he was severely burned by a 4,000 volt copper-to-copper arc as he entered the switch-gear room in Building 118 at the base. The accident happened as he entered the room to perform maintenance work on the transfer switch assembly housed in a free-standing metal cabinet.
At the conclusion of discovery all defendants moved for summary judgment, denying any legal responsibility to plaintiff. In addition to a factual denial of responsibility, Martin relied on the bar of N.J.S.A. 2A:14-1.1, asserting that "any deficiency in the design, planning, supervision or construction of an improvement to real property" for *184 which it was allegedly responsible as causative of plaintiff's injuries was barred because any services which it furnished in the installation of the structure were rendered more than ten years before the accident.
The report of plaintiff's expert consulting engineer, Walter LaPierre, was the focal point on the motion for summary judgment, because of the electrically sophisticated nature of the claim. Plaintiff used the report of LaPierre to resist defendants' respective factual contentions that they made no causative contribution to the accident. LaPierre's report was based on a review of plaintiff's counsel's file and a visit to the site. He described the mechanism of injury as follows: "[H]is burns were the result of externally applied heat. This heat came from a copper to copper 4 Kv. electric arc which expelled a violent burst of intensely heated air, copper vapor, and molten copper particles against the front of his body from his thighs to his head." Brown was burned over 50% of his body.
The arc occurred across the tops of the movable blades of a transfer switch housed in a free-standing metal console or cabinet-type assembly inside the switch-gear room. Plaintiff was standing three to four feet in front of the transfer switch when the arcing occurred. Plaintiff walked in front of the switch-cabinet door at the precise instant when the arcing occurred. He was exposed to current on the order of 20,000 amperes until the fuses blew, probably in 1/10 of a second.
Brown had originally responded to a trouble call on the day of the accident concerning an erratically functioning computer. The problem was caused by line-voltage fluctuation which was ultimately resolved months later by installation of stabilizing transformers within a van housing the computer. After several trouble-shooting routines were tried Brown was assigned to clean three load-interruptors located in the diesel housing contained in the transfer-switch assembly cabinet in Building 118. Brown was proceeding to this task when the accident occurred.
*185 The metal door on the front of the switch-gear cabinet was open at the time of the accident. This metal door, if closed, would have fully protected the metal switch blades from conditions external to the cabinet, such as moisture. Plaintiff and a coemployee had been in the switch-gear room in Building 118 a few minutes before the accident. They had opened the cabinet door to inspect the switch-gear blades. At his deposition plaintiff could not recall if he or his coemployee closed the cabinet door before they left the building. Plaintiff then returned a few minutes later and the last thing he remembered was walking through the doorway to Building 118.
Plaintiff's expert directed his inquiry to the crucial question, "What made the switch [-gear] blade tips arc over?" He concluded that "there are several factors in the development of a most probable answer to this question, (1) the weather, (2) the ventilating opening on the wall of the switchgear room, and (3) the location of Building 118."
LaPierre's analysis proceeded as follows. He first noted that "unusually violent weather patterns" persisted at the time of the accident and concluded that "Very probably the switch arc over was encouraged by a strong electrostatic voltage induced by electrical disturbances in the atmosphere."
Secondly, and most significantly on the issue of these de-defendants' liability, with respect to the ventilating opening, plaintiffs' expert stated:

(2) The ventilating opening:

The switchgear room was provided with a single ventilating opening in the outside wall. This opening was three feet wide by two feet high. It was 48 inches above the floor and six feet from the far end of the room. See Figure 2.
It can be seen from Figure 2 that wind-driven rain could reach the interior of the diesel generator end of the transfer switch if the door were wide open  as it was at the time of the accident. For a room of this type, this ventilating scheme is unusual and dangerous. Rain driven into the exposed, uninsulated transfer switch blades would cause the fireworks endured by Mr. Brown.
*186 In electrical equipment rooms or vaults of this type, it is standard practice to locate one ventilation opening near the floor and one near the roof to remove any heated air and to keep the room dry.
Thirdly, LaPierre concluded, "The switchgear room is in a building located on the summit of a hill in the Highlands." This location exposed the structure to the full force of wind and weather.
A supplemental report by LaPierre more specifically pinpointed the inadequate nature of the protective measures for the electrical equipment, insofar as they bore on Brown's accident. He stated as follows:

PROTECTIVE ARRANGEMENTS
In my report of February 11, 1975 the cause of the 4 kv flashover, which burned Donald Brown, was postulated to be wind driven rain. An open window at eye level height existed in the switchgear room where the accident occurred. The existence of the open window was contrary to American National Standards:
I  National Electrical Safety Code (ANSI C2) 1973. Section 11, 110 General Requirements.
B. Rooms and Spaces.
"All rooms and spaces in which electric supply equipment is installed shall comply with the following requirements."
3. Ventilation.
"There should be sufficient ventilation to maintain operating temperatures within ratings and to prevent the accumulation of airborne contaminants under any operating conditions."
4. Moisture and Weather.
"They should be dry. "
II. National Electric Code, 1975.
Article 450-Transformers and Transformer Vaults.
Section 45. Ventilation Openings, (b) Arrangement.
"A vault ventilated by natural circulation of air shall be permitted to have roughly half of the total area of openings required for ventilation in one or more openings near the floor and the floor and the remainder in one or more openings in the roof or in the sidewalls near the roof; or all of the area required for ventilation shall be permitted in one or more openings in or near the roof."
In our view these allegations pinpoint the alleged cause of the accident to the deficient design of the physical structure's ventilation system, which failed to neutralize the adverse effects of moisture and weather, in combination with *187 the location of the transfer switch assembly cabinet located directly across the room from the open louvered window. This design permitted rain to be driven into the exposed, uninsulated transfer switch blades when the cabinet was open. It is clear that the exposed, uninsulated condition of the switch blades, although one of the conditions of the accident, is not claimed to be a negligently causative factor by plaintiff's expert. The blades must necessarily be uninsulated so the circuits can close and the system function.
We note nothing in LaPierre's reports, or at any other place in the record, suggesting that Jersey Central, as the supplier of commercial power, in any way breached a legal duty by causing or being responsible for the voltage fluctuations which triggered the events leading to the accident of July 30, 1971. Moreover, there is nothing in the expert's reports which implicates the alleged suppliers of electrical equipment, S & C and G & W, with respect to the ventilation problems or the positioning of the transfer switch cabinet in Building 118. Nor do we find anything else in the record which could create a factual issue on whether S & C or G & W violated any industry safety standard, performed any negligent service or provided any defective equipment which causatively contributed to plaintiff's injury. On the record before him the trial judge was correct in granting summary judgment in favor of Jersey Central, S & C and G & W, there being no evidence of causative negligence on their part.
We are therefore ultimately concerned with whether the trial judge properly granted summary judgment as to defendant Martin. The trial judge correctly concluded that plaintiff had no actionable claim against Martin, if such claim could be considered as "arising out of any defect or unsafe condition of an improvement to real property" or because of "any deficiency in the design, planning, supervision or construction" of an improvement to real property. N.J. *188 S.A. 2A:14-1.1.[1] All of Martin's work with respect to Building 118 had been completed and accepted by mid-1960, or more than ten years before this accident in July 1971. Therefore, assuming that Martin was responsible for the installation of the improperly placed ventilating window in the exterior wall, which window caused the transfer switch assembly to be exposed to the rain, the statute is a complete bar to plaintiff's claim to the extent that the claim arose out of the creation of the structure itself.
However, because of the unusual nature of this structure and what it housed, it is necessary to look closer at Martin's role in the undertaking. As we stated above, according to plaintiff's expert, the structural ventilation defect combined with the location of the transfer switch cabinet proximate thereto caused the accident. Even though Martin is immunized from liability for damages caused by a defect in the structural wall because of N.J.S.A. 2A:14-1.1, this does not automatically preclude liability if the transfer switch assembly cabinet is not also "an improvement to real property" under the statute. Martin's design and construction activities relevant to the cabinet could result in liability if the cabinet is so independent of the structure as not to be within the statutory ambit.
*189 The following portions of the record disclose Martin's involvement with the construction of the missile site and installation of the equipment on this unusual site. Martin made these factual and legal contentions in the pretrial order:
The defendant, Glen L. Martin Company, is a predecessor company of Martin Marietta Corporation, the Glen L. Martin Company name having been phased out in 1957. In August of 1955, the Glen L. Martin Company entered into a contract with the U.S. Government to provide a rack and console center system known as "Master Missile". The company provided "base line standard drawings" which represented an approved master missile installation. This installation was then modified to fit the peculiarities of its intended site. These modifications would be accomplished by the Army Corps of Engineers. Work on the complete master missile complex and its installation was closed out by the Martin Orlando Division in 1959.
We deem it fairly inferable from this statement that Martin exercised substantial control over the design of the entire missile system of which Building 118 and its contents were a part.
Several affidavits of Martin employees also indicate, to some extent, its participation in the project. L.J. Draper, a design and architectural engineer, averred that he was "familiar with the Missile Master System installed at the Highlands Air Defense Site." Draper made the following statements in his affidavit:
2. Missile Master was a sophisticated air defense system consisting of Martin designed rack and console equipment housed in a government furnished building which was of special design and built on government property by the Corps of Engineers and building contractors hired by the Corps of Engineers.
3. Since the Missile Master Building was to house Martin Equipment the Company established and furnished "baseline standard drawings" which represented an approved Missile Master installation, but did not represent its application to any particular geographical area.
4. Upon receipt of such "baseline standard drawings" the District Office of the Corps of Engineers would change the building installation design in whole or in part to fit the peculiar geographical or terrain requirements of a specific installation site. For example, a high elevation site such as Colorado may require a poured foundation *190 on a mountain slope with a costly copper earth-ground mat installed deep in the earth prior to pouring the foundation, whereas an installation placed on land with a high water table may only require a ground rod of limited length to serve as an electrical ground for the equipment.
5. As no two sites are alike the District Office of the Corps of Engineers was responsible for adapting the "baseline standard drawings" to redraw the design to satisfy the geography and terrain of the site, using Martin's plans only as a guide.
6. Martin Marietta Corporation did not design or construct the Missile Master System Housing, nor direct or supervise the detailed design or construction of the building in question.
7. All such work was done under the supervision and direction of the United States Army Corps of Engineers which operated through the United States Army Signal Air Defense Engineering Agency.
From Draper's affidavit it may be inferred that Martin participated in the design, including the location of rack and console equipment housed in these specially designed buildings. However, Martin through Draper denied directing or supervising "the detailed design or construction of the building in question." Therefore it is most difficult to determine from Martin's admissions in the pretrial statement and from Draper's affidavit exactly what Martin had to do with designing the location of the transfer switch assembly in close proximity to the ventilation defect allegedly contained in Building 118.
An additional affidavit was submitted on behalf of Alfred J. Fennelly, a Martin employee. Fennelly's affidavit stated:
1. I am a manufacturing engineer, employed by Martin Marietta Corporation, successor company to the defendant, Glen L. Martin Company. During the period of 1959 and 1960 I was engaged in supervising the installation of the Missile Master System at the Highlands Defense Site in New Jersey. The Highlands Defense Site was known as the "New York Site" since the Missile Master System installed there was intended to defend the New York City area. I was the manager of the New York Site during the installation period of the Missile Master System.
2. I have reviewed my records to determine when the New York Site was turned over to the U.S. Government upon completion of the Missile Master System installation. I have located an undated report entitled "Department 834 Missile Master/Birdie Field Activation" *191 attached hereto as Exhibit 1, which shows on Page 2 thereof that I was Site Manager for New York and that installation (* * * this line illegible * * *) located a document entitled "Activation Division" with a pencil notation, "For Management Proposal inputs 8/6/65" attached hereto as Exhibit 2, which on Page 4 thereof shows that the New York Site was accepted by the Government in May, 1960. These documents are in accord with my personal recollection that the New York Site was turned over to the Government in mid-1960.
This affidavit was no doubt submitted to establish the firm cut-off date for the rendering of Martin's services as mid-1960, so as to insure the applicability of N.J.S.A. 2A:14-1.1 to that defendant. But in the affidavit Fennelly admits "supervising the installation of the Master Missile System" and describes himself as the "manager of the New York Site during the installation period."
We think these affidavits were sufficient in the context of this case to create an issue of fact as to Martin's control over the final installation of the project, including the location of equipment in Building 118 which housed the transfer switch assembly. At oral argument all parties acknowledged the difficulty they had in developing the facts of the case in view of the passage of time and the Federal Government's legitimate interest in security. However, we conclude that the statements in the affidavits of Draper and Fennelly, and Martin's pretrial contention, create a sufficient factual question of Martin's involvement in the actual design and construction of the Atlantic Highlands project to withstand a motion for summary judgment on the contention that they had no control over the creation of the potentially actionable defect, the improper location of the transfer switch assembly cabinet near the permanently open louvered ventilation window. What the ultimate proofs disclose must always await trial but the present record generates sufficient factual issues to defeat the claim that Martin is entitled to summary judgment as a matter of law on the issue of control. R. 4:46-2.
*192 Under our analysis the final question for resolution is whether the alleged participation of Martin in the design, planning, supervision or construction of the transfer switch assembly cabinet and its internal components is within the scope of the language "an improvement to real property" as set forth in N.J.S.A. 2A:14-1.1. The trial court held that the creation of this equipment was within the statutory concept of an "improvement to real property."
The color photographs and design plans identified at depositions show the transfer switch assembly to be a free-standing metal cabinet about eight feet high, ten feet long, and three to four feet deep. The metal cabinet is anchor-bolted to the floor. It contains three discrete units housing (1) commercial power switches, (2) a control compartment, and (3) the diesel generator power switches. Each compartment has a separate door. The diesel generator power switch unit door was open when the accident occurred. The louvered ventilation window was located almost directly across the room from the diesel switch unit, on the opposite wall.
The transfer switch assembly cabinet is housed, with other related equipment, in a 25' x 17' cinderblock building, designated on the plans as "Switch Gear Room Bldg. 118." The equipment in this small building permits the missile site to switch back and forth from external commercial power to its own internal power from diesel generators. The electrical equipment contained inside the transfer switch assembly cabinet controls the opening and closing of the circuits for the internal power source. Since the missile site is presumably an important defense facility, this equipment, which provides the capability to transfer to a power source independent of ordinary commercial power, is critical to the site's function as part of the regional defense network.
N.J.S.A. 2A:14-1.1 was adopted, effective May 18, 1967, as a legislative response to the then expanding liability concepts in this jurisdiction concerning the legal responsibility of contractors, architects, engineers, and others *193 involved in creating improvements to real estate. See, generally, the discussion in Rosenberg v. North Bergen, 61 N.J. 190, 194-198 (1972). The statute cuts off all claims after ten years from the time of the furnishing of services, or the performance of construction, irrespective of the date of injury. O'Connor v. Altus, 67 N.J. 106, 109 (1975).
N.J.S.A. 2A:14-1.1 was first considered by our Supreme Court in Rosenberg v. North Bergen, supra. In that case plaintiff caught her heel in a defective roadbed and sought to recover from a paving company which she alleged had negligently repaved the roadway more than ten years before her accident. Our Supreme Court held that the repaving of the real estate constituted an "improvement to real property" within the intent of N.J.S.A. 2A:14-1.1. The framework for analysis used by our Supreme Court is instructive in the resolution of the problem before us. In the Rosenberg opinion Justice Mountain points up that the available materials treating the legislative history of N.J.S.A. 2A:14-1.1 "are meager and unrevealing." Id. 61 N.J. at 194. By the time of the Rosenberg opinion in 1972 more than 30 states had adopted similar statutes. At present in excess of 40 states have done so.[2] Justice Mountain concluded that the statute was New Jersey's legislative response to the judicial liberalization of the traditional bar of the statute of limitations, resulting from the development of the so-called "discovery rule," the abolition of the immunity afforded by the "completed and accepted" rule, and the doctrine of Schipper v. Levitt & Sons, Inc., 44 N.J. 70 (1965). Thus, any construction of the act should recognize *194 the legislative intent "to provide what it deemed to be a reasonable measure of protection against this greater hazard." Id. 61 N.J. at 198. See also, Hudson Cty. v. Terminal Construction Co., 154 N.J. Super. 264, 269 (App. Div. 1977). The following language of our Supreme Court reflects that commitment to a reasonably broad construction of the statute.
If the condition to which the Legislature addressed itself was this extension of potential liability, then there seems no reason not to include within the favor of the statute all to whom this condition may adhere whether they be planners and builders of structures, roads, playing fields or aught else that by broad definition can be deemed "an improvement to real property." We prefer to read the statute, consonant with what we thus judge to have been the legislative intent, as applying to all who can, by a sensible reading of the words of the act, he brought within its ambit. We therefore conclude that the statute does apply to the facts of this case. [Rosenberg v. North Bergen, 61 N.J. at 198]
Further indication of the proper approach to the construction of the statute is found in the following language by the court discussing the class of persons intended to be benefitted by the statute:
For convenience we have referred to the beneficiaries of this legislation as architects and building contractors. But the favored class is much larger. It includes "any person performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property." We do not attempt at this time to enumerate all of the classes of persons coming within this statutory group. These might include, as examples only, the designer of a sewerage plant for a development complex, a landscape gardener or a well driller. We can find here no such exclusion from the class as to justify a determination that this is a special law coming within the prohibition of our state Constitution. [Id. at 201]
No reported New Jersey case is helpful in applying the statutory language, "improvement to real property," to the particular facts before us. A Law Division opinion by Judge Dreier is an interesting illustration of one context in which these cases can arise. In Ilich v. John E. Smith *195 Sons Co., Inc., 145 N.J. Super. 415 (Law Div. 1976), a workman lost an arm while using an allegedly defective meat grinding machine. He claimed that the actionable defect in the machine was the absence of an "on-off" switch located conveniently within arm's length of the machine. The "on-off" switch was remotely located out of arm's reach on a wall. Defendant was an electrical contractor who wired the machine on location at the premises of plaintiff's employer. Defendant argued that wiring the meat grinding machine on location in the factory was contributing to the construction of an improvement in real property. The defendant claimed his contention was enhanced by the fact that he had also wired the entire premises during the course of its conversion from a theatre to a butcher shop. The court in Ilich quite properly held that defendant's attempt to seek refuge in the time bar of N.J.S.A. 2A:14-1.1 was improper, notwithstanding his dual role of wiring both the building and the meat grinding production machine. The court pointed up that wiring a meat grinder is no more related to the function of the building as real property than repairing a chair or a table.
The legislative intent in adopting N.J.S.A. 2A:14-1.1, as elaborated by the Rosenberg opinion, quite obviously was not to limit the exposure of manufacturers and purveyors of products which are used in the factory, shop or home, or those who service these products. As best we can perceive, the intent of the language of the statute was to protect those who contribute to the design, planning, supervision or construction of a structural improvement to real estate and those systems, ordinarily mechanical systems, such as heating, electrical, plumbing and air conditioning, which are integrally a normal part of that kind of improvement, and which are required for the structure to actually function as intended.
In the case before us, for the reasons hereinafter set forth, we hold the transfer switch assembly cabinet to be part of an improvement to real property and within the *196 protection of N.J.S.A. 2A:14-1.1. Therefore, even if plaintiff could establish at trial that the defendant Martin was negligent in carelessly designing and constructing the cabinet in juxtaposition with the improperly located ventilation window on the exterior wall, plaintiff's action would be time-barred by the statute. Martin, as a designer and builder, was certainly within the class of persons intended to be protected by the statute. The transfer-switch assembly housed in Building 118 was an integral part of an electrical system designed to supply all power needs of the missile site. Quite obviously the missile site required equipment so it could operate on internal power, as well as commercial power. Without an alternate power source the site could not have functioned as a key part of the defense network if enemy attack or other causes interrupted the commercial power supply. Therefore, the internal diesel generator power equipment, including its switch-gear assembly which allegedly caused plaintiff's injury, was not an optional frill, in addition to the normal electrical system, but was a necessity in this installation. It constituted a permanent part of one of the mechanical systems necessary to the normal function of this particular improvement to the real estate. It should therefore be included within the scope of the statute if the protection desired by the Legislature, and as broadly described by the Rosenberg case, is to be accomplished.[3] By *197 contrast, equipment, or chattels brought into a structure after it is architecturally and mechanically suitable for occupancy for the purpose intended should be exempted from the statute, e.g., furniture, production machinery, appliances, etc.
For examples of cases holding instrumentalities to be improvements to real estate under similar statutes see Pinneo v. Stevens Pass, Inc., 14 Wash. App. 848, 545 P.2d 1207 (Ct. App. 1976) (steel support tower for a ski lift); Kozikowski v. Delaware River Port Auth., 397 F. Supp. 1115 (D.N.J. 1975) (interstate bridge spanning the Delaware River); Nevada Lakeshore Co. v. Diamond Elec. Inc., 89 Nev. 293, 511 P. 113 (Sup. Ct. 1973) (electrical wiring in swimming pool in apartment complex); Wiggins v. Proctor and Schwartz, 330 F. Supp. 350 (E.D. Va. 1971) (a large production line machine bolted to floor). Under our rationale developed above we disagree with the result in the Wiggins case. Cases holding instrumentalities not to be improvements to real estate include Turner v. Marable-Pirkle Inc., 238 Ga. 517, 233 S.E.2d 773 (Sup. Ct. 1977) (utility pole and its energizing ground wire); Commercial Union Co. v. Electric Corp., 15 N.C. App. 406, 190 S.E.2d 364 (Ct. App. 1972) (furnace transformer); Ciancio v. Serafini, 574 P.2d 876 (Colo. App. 1977), cert. den. ___ Colo. ___ (Colo. Sup. Ct. 1978) (engineer's boundary survey).
For the reasons stated we agree the trial judge properly held that the transfer-switch assembly cabinet, which housed the electrical equipment and which allegedly combined with the structural defect in the open louvered ventilation window in Building 118 to cause plaintiff's injuries, was an "improvement to real property" within the intent of N.J.S.A. 2A:14-1.1; it was an integral part of the electrical system of *198 the missile site, which required an alternate internal power source to function properly. Consequently, any cause of action against Martin is time-barred by the statute.
Affirmed.
NOTES
[1] "No action whether in contract, in tort, or otherwise to recover damages for any deficiency in the design, planning, supervision or construction of an improvement to real property, or for any injury to property, real or personal, or for an injury to the person, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained on account of such injury, shall be brought against any person performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property, more than 10 years after the performance or furnishing of such services and construction. This limitation shall not apply to any person in actual possession and control as owner, tenant, or otherwise, of the improvement at the time the defective and unsafe condition of such improvement constitutes the proximate cause of the injury or damage for which the action is brought."
[2] A model statute endorsed by the American Institute of Architects, the National Society of Professional Engineers, and the Associated General Contractors suggests a four-year time limitation; the enacted statutory periods vary from 4 to 12 years, with a substantial number of states adopting a ten-year period of limitation. Comment, 18 Cath. U.L. Rev. 361, 365-366 (1969). See Comment, 60 Kent. L.J. 462, 464 (1972); see also, Note, "Malpractice: The Design Professional's Dilemma," 10 J. Mar. J. of Prac. & Pro., 287 (1977).
[3] In the case before us plaintiff's expert, LaPierre, cites several violations of the National Electrical Code as contributory to this accident. Since the passage of the Uniform Construction Code Act. L. 1975, c. 217; N.J.S.A. 52:27D-119 et seq., the Department of Community Affairs has been designated as the state-wide regulatory agency with respect to construction standards. As part of its regulations, the Department of Community Affairs adopted N.J.A.C. 5:23-3.6, which designates the "National Electrical Code of 1975" as the controlling electrical construction code in New Jersey. If a code violation exists, no certificate of occupancy may be issued to the owner. N.J.S.A. 52:27D-133. Our interpretation of the language, "improvement to real estate," in N.J.S.A. 2A:14-1.1 as including permanent, integral parts of the electrical system, required for a building to function for the purpose it was designed, is compatible with the regulatory approach that buildings with construction code violations in their permanent electrical systems are not suitable for occupancy. Permanent components of the electrical system included under the time-limitation statute, N.J.S.A. 2A:14-1.1, are subject to construction code control under N.J.S.A. 52:27D-119.