818 A.2d 330 (2002)
358 N.J. Super. 587
Stan BINIEK, et al., Plaintiffs,
v.
EXXON MOBIL CORP., Gulf Oil Corp. Gulf Oil Div. of Cumberland Farms, Inc., McFarland & Sons, Inc., Dick Martini, Chris Poulson, Bridgewater Township, Stem Brothers, Inc., John Doe Affiliates, John Doe Distributors, John Doe Employees, John Doe Manufacturers, John Doe Suppliers, John Doe 1-75, Defendants.
Superior Court of New Jersey, Law Division.
February 5, 2002.
*332 Stacy S. Cohen, for defendant Stem Brothers, Inc. (Reed Smith, LLP, attorneys).
Maria K. Anastasia, for plaintiffs (Wilentz, Goldman & Spitzer, attorneys).
*331 RUGGIERO WILLIAMS, J.S.C.
This matter comes before this Court by way of Defendant Stem Brothers Inc.'s ("Stem Brothers") motion for summary judgment. The various plaintiffs in this consolidated toxic tort action oppose this motion.
Plaintiffs are residents and visitors of certain neighborhoods in Bridgewater Township. In September and October of 1998, the Township of Bridgewater advised them that their well water was contaminated. Plaintiffs allege that their potable water supply was contaminated by methyl-tertiary butyl ether ("MTBE")[1], a component of gasoline, as a result of leakage from underground tanks at nearby McFarland's Pitstop `n Wash gasoline station ("McFarland's"). Plaintiffs live down gradient of the gasoline station. The McFarland's facility has operated as a service station since 1951. The predecessor tanks had been removed one and a half years prior to the installation of the tanks which forms the basis of this suit. Stem Brothers sold and helped to install three 6000 gallon, single-walled fuel tanks at McFarland's in 1981. Stem Brothers purchased hundreds of storage tanks from different tank manufacturers and kept an inventory of them. The tanks were placed in an existing excavation pit and hooked up to existing piping. Stem Brothers also installed some new fittings and piping. Rick Stem, Vice President of Stem Brothers, participated in the tank installation. Mr. Stem recalled pressure testing the tanks prior to their installation. The tanks were then placed in the existing excavation pit and connected to pre-existing lines that were left extruding at the sidewalls of the pit. 116 feet of additional piping was installed for vent lines and connected to existing product lines. Stem Brothers also performed post-installation testing prior to product being placed in the tanks. The excavation was backfilled by Stem Brothers. Although there may have been some other minimal work performed, this appears to be the crux of Stem Brothers' involvement in the 1981 installation.
Between March 1981 and January 1992, Stem Brothers acted as a "jobber," distributing gasoline and motor oil to McFarland's with deliveries being made by common carrier. The tanks were modified by a third party in 1992. In 1996 the *333 tanks were removed from McFarland's, at which time one tank was found to have holes that compromised its integrity. Cleanup of the resultant contamination is presently ongoing, under the direction of the New Jersey Department of Environmental Protection ("NJDEP"). Any cleanup action is not part of the instant suit. Plaintiffs do not allege that there are any ongoing health risks. Any property whose water supply had the potential to be adversely affected has been connected to the municipal water supply. Plaintiffs in seek recovery solely for damages incurred as a result of exposure to contaminants that emanated from the gasoline station.
Stem Brothers brings this motion for summary judgment under two distinct theories. First, it asserts that plaintiffs' claims are barred by N.J.S.A. 2A:14-1.1, commonly referred to as a statute of repose, in that they arise out of any alleged defective or unsafe condition of the tanks installed in 1981. Defendant argues that the tanks constitute "improvements to real property" and "construction activity" within the meaning of the statute and therefore are time barred. Second, defendant contends that it is not strictly liable for its role in supplying gasoline to McFarland's, as it made no deliveries to the station and the supply of gasoline is not an abnormally dangerous activity. Stem Brothers asserts that summary judgment is warranted under these circumstances. Defendant does not seek summary judgment with respect to the product liability or negligence theories asserted by plaintiffs.
Plaintiffs oppose this application arguing that N.J.S.A. 2A:14-1.1 does not bar their claims because this matter does not involve improvements to real property as defined by the statute. Additionally, they argue that N.J.S.A. 2A:14-1.1 imposes a continuing duty to warn of potential dangers, which is not cut short by the statute of repose. With respect to Stem Brothers' second argument, plaintiffs counter that it can indeed be held strictly liable for both its supply of gasoline to the subject site and the 1981 sale of the storage tanks and piping. Finally, plaintiffs contend that Stem Brothers negligently sold and installed the tanks and pipes, negligently supplied gasoline to defective tanks, and negligently failed to warn of the dangers posed by the allegedly defective tanks.
It is self-evident that this motion is to be decided based on the principles of summary judgment. R. 4:46-2; Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954); Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995). The summary judgment standard requires the moving party to establish there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. R. 4:46-2; Judson, supra, 17 N.J. at 73-75, 110 A.2d 24.
Here, Stem Brothers has asserted that there is no genuine issue of material fact because plaintiffs' claims against it are barred by the statute of repose. N.J.S.A. 2A:14-1.1 provides, in relevant part:
No action whether in contract, in tort, or otherwise to recover damages for any deficiency in the design, planning, supervision, or construction of an improvement to real property, or for any injury to property, or for any injury to property, real or personal or for any injury to the person, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property... shall be brought against any person performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property, more than 10 years after the performance *334 or furnishing of such services and construction. This limitation shall serve as a bar to all such actions both governmental and private but shall not apply to actions against any person in actual possession and control as owner, tenant, or otherwise, of the improvement at the time the defective or unsafe condition of such improvement constitutes the proximate cause of the injury or damage for which the action is brought. [N.J.S.A. 2A:14-1.1.]
The purpose of the statute of repose "is to provide a measure of repose and prevent `liability for life' against contractors and architects." Russo Farms, Inc. v. Vineland Bd. of Educ., 144 N.J. 84, 117, 675 A.2d 1077 (1996), quoting Hudson County v. Terminal Constr. Corp., 154 N.J.Super. 264, 268, 381 A.2d 355 (App.Div.1977), certif. denied, 75 N.J. 605, 384 A.2d 835 (1978). A statute of repose "is not really a statute of limitations at all, at least in the traditional understanding of that term." E.A. Williams, Inc. v. Russo Dev. Corp., 82 N.J. 160, 167, 411 A.2d 697 (1980). The statute does not "bar" a remedy "in the sense of providing an injured person a certain time to institute suit after the `accrual' of a `cause of action.'" Ibid.; Hein v. GM Constr. Co., Inc., 330 N.J.Super. 282, 286, 749 A.2d 422 (App.Div.2000). Rather, it prevents what might otherwise be a cause of action from ever arising. Injury occurring more than ten years after the performance of the negligent act simply forms no basis for recovery at all. Ibid.
The Legislature intended that N.J.S.A. 2A:14-1.1 should apply "to all who can, by a sensible reading of the words of the act, be brought within its ambit." Rosenberg v. North Bergen, 61 N.J. 190, 198, 293 A.2d 662 (1972). In general, an improvement to real property is considered to be a modification that permanently increases the property's value. 21 Am.Jur.2d, Improvements, § 1 (1968); Black's Law Dictionary (4th ed.1968). Among the relevant factors in determining whether a change to property constitutes an improvement under the statute are "whether the modification or addition enhances the use of the property, involves the expenditure of labor or money, is more than mere repair or replacement, adds to the value of the property, and is permanent in nature." Ebert v. South Jersey Gas Co., 157 N.J. 135, 139, 723 A.2d 599 (1999), quoting Van Den Hul v. Baltic Farmers Elevator Co., 716 F.2d 504, 508 (8th Cir.1983). However, the statute was not intended to benefit manufacturers and sellers of products who were uninvolved in the design, planning, and construction of improvements to real estate. Wayne Twp. Bd. of Educ. v. Strand Century, Inc., 172 N.J.Super. 296, 302, 411 A.2d 1161 (App.Div.1980). The sale and installation of a mass produced, mass marketed item does not constitute the "design, planning, supervision or construction of an improvement to real property" as envisioned by the statute. Rolnick v. Gilson & Sons, Inc., 260 N.J.Super. 564, 567-68, 617 A.2d 288 (App.Div.1992).
Pitney Bowes v. Baker Indus., 277 N.J.Super. 484, 649 A.2d 1325 (App.Div. 1994), supports the applicability of N.J.S.A. 2A:14-1.1 to a case of this nature. While speaking in the context of a case governed by the Spill Act, the court noted that but for Spill Act implications "the defendants would be otherwise entitled to the benefit of the ten year repose." Id. at 485, 649 A.2d 1325; N.J.S.A. 58:10-23.11. The instant case, where there is alleged fuel leakage but no potential for liability under the Spill Act, appears to be the precise factual scenario envisioned by the court in Pitney Bowes.
*335 Here, the issue for the court's determination is whether the sale and installation of the gasoline tanks by Stem Brothers into a pre-existing piping system constitutes "the design, planning, supervision, or construction of an improvement to real property" within the meaning of N.J.S.A. 2A:14-1.1. The court finds that these actions do not fall within the parameters of the statute for two alternative and independent reasons.
First, the court is unable to conclude that Stem Brothers participated in the design, planning, supervision, or construction of the gasoline tanks at the McFarland's site. It is uncontroverted that it acted as a distributor and installer of pre-fabricated tanks. The tanks were designed and manufactured by third parties. Therefore the court is guided by the decision in Rolnick v. Gilson & Sons, Inc., 260 N.J.Super. 564, 617 A.2d 288 (App.Div. 1992), which the court considers to be on point. The defendant in Rolnick sold and installed a defective ventilator fan to the plaintiffs. The Rolnick court held that this conduct did not constitute an improvement under N.J.S.A. 2A:14-1.1, stating:
We regard the supplier as the vendor of a product, and we are persuaded that in respect of that component of the transaction, his status is not converted to that of a protected customer merely because he wires the appliance instead of plugging it in, or because he creates an aperture into which the appliance is to fit, or because he in some other way `installs' it. [Id at 568, 617 A.2d 288]
The Rolnick court cited with approval Ilich v. John E. Smith Sons Co., Inc., 145 N.J.Super. 415, 367 A.2d 1216 (Law Div. 1976), which reached a similar conclusion with respect to the sale and installation of a meat grinding machine in a butcher shop, despite the fact that some wiring was required.
In the case at bar, the court finds that Stem Brothers acted merely as a vendor and installer. They are therefore not entitled to the protection afforded by the statute. Under Rolnick and Ilich, supra, and a common sense reading of N.J.S.A. 2A:14-1.1, the court finds that Stem Brothers did not design, plan, or construct the gasoline tanks, nor did it design the gasoline delivery system. Rather, it sold and implemented a mass produced, interchangeable item. While it was necessary to attach and make calibrations, the court views such conduct as distinguishable from the design of the entire system of gasoline delivery, which might have been considered an improvement to the station.[2] Stem Brothers' actions are easily distinguishable from those of the defendant in Brown v. Central Jersey Power & Light Co., 163 N.J.Super. 179, 394 A.2d 397 (App.Div.1978), upon which defendant relies. Unlike the Brown defendant, Stem Brothers cannot be fairly said to have "exercise[d] substantial control over the design" of the gasoline tanks. Id. at 189, 394 A.2d 397. Further, the installation of new piping and its connection to existing piping is analogous to the wiring performed by the defendants in Rolnick, supra and Ilich, supra. While the court recognizes the distinction between an underground gasoline tank in a retail gasoline *336 station, which may appear integral to the business' operations, and an ordinary appliance in a residence (such as a ventilator fan), the court is not persuaded that this distinction alters the conclusion the court has reached. Certainly a meat grinder is as integral to a butcher shop as a gasoline tank is to a gas station. In either case, however, the lack of any design activity on the part of the vendor/installer is a fatal flaw to their attempted reliance on N.J.S.A. 2A:14-1.1.
Second, the court finds that Stem Brothers' activities do not amount to an "improvement to real property" under N.J.S.A. 2A:14-1.1. As the Supreme Court enunciated in Ebert v. South Jersey Gas Co., 157 N.J. at 139, 723 A.2d 599, the relevant factors in such a determination are "whether the modification or addition enhances the use of the property, involves the expenditure of labor or money, is more than mere repair or replacement, adds to the value of the property, and is permanent in nature." In the instant matter, the court finds that Stem Brothers' actions in 1981 amount to a "mere replacement" as contemplated by Ebert. The gasoline station in question had been operating in that capacity since 1951. Prior to the 1981 installation, the tank area had been vacant for approximately one and a half years. Stem Brothers removed existing underground tanks and replaced them with new ones, which in turn were replaced in 1997. Such replacement is part of the normal upkeep and maintenance of a gasoline station, and there is nothing to indicate that the newly installed tanks improved the gas station in the sense intended by the statute. Rather, they were necessary replacements of fungible items that had reached the endpoint of their useful life span. The tank replacement was neither a modification nor an addition but simply permitted the continuation of a pre-existing use of the subject property. Further, the tanks are not permanent in nature, but instead have a finite useful period for use, as evidenced by their subsequent replacement. The court thus finds that the replacement of underground gasoline tanks in this instance does not amount to an "improvement to real property" under N.J.S.A. 2A:14-1.1. An analogy can be made to the repair of a roadway. While the engineers who initially design a major highway may benefit from the statute of repose, the public entity who later replaces a worn section of guardrail with one of better quality, while enhancing its condition, has not improved the property for purposes of N.J.S.A. 2A:14-1.1. Stem Brothers is therefore unable to avail itself of the protection afforded by the statute of repose.
It is also asserted that defendant cannot be held strictly liable for its role in either the supply or storage of gasoline at the McFarland's site. With respect to these claims of strict liability, New Jersey has adopted the doctrine of abnormally dangerous activity. This doctrine imposes liability on those who, despite social utility, introduce an extraordinary risk of harm into the community for their own benefit. T & E Indus. v. Safety Light Corp., 123 N.J. 371, 386-87, 587 A.2d 1249 (1991); Berg v. Reaction Motors, 37 N.J. 396, 412, 181 A.2d 487 (1962). Although the law will tolerate such hazardous conduct, the risk of loss is allocated to the enterpriser who engages in it. T & E Indus., supra, at 387, 587 A.2d 1249; Berg, Id., at 410, 181 A.2d 487. To determine the doctrine's applicability, New Jersey has adopted the principles set forth in Restatement of Torts, 2d. State Dept. of Envtl. Protection v. Ventron Corp., 94 N.J. 473, 488, 491, 468 A.2d 150 (1983). In holding "that a landowner is strictly liable to others for harm caused by toxic waste that are stored on *337 his property and flow on to the property of others," the Ventron court traced the evolution of this legal principle. Id. at 488, 468 A.2d 150. For our purposes, it is not necessary to revisit that explanation. The significant holding of Ventron is that whether an activity is abnormally dangerous is to be determined on a case by case basis.[3]Id. at 491, 468 A.2d 150. In considering the issue, a court is guided by the following factors:
(a) existence of a high degree of risk of harm to the person, land or chattels of others;
(b) likelihood that great harm would result therefrom;
(c) the inability to eliminate those risks through the exercise of reasonable care;
(d) the common usage of the activity;
(e) the appropriateness of the activity; and
(f) the value of the activity to the community.
[Restatement (Second) of Torts, § 520 (1977); Bahrle v. Exxon Corp., 279 N.J.Super. 5, 37-38, 652 A.2d 178 (App. Div.1995), aff'd 145 N.J. 144, 678 A.2d 225 (1996).]
The issue of whether gasoline storage is an ultrahazardous activity has not often been a topic of discussion in New Jersey courts. See State v. Exxon Corp., 151 N.J.Super. 464, 484, 376 A.2d 1339 (Ch. Div.1977). The only published opinion in the state to directly address the issue declined to apply such a label to gasoline storage or transport.
We must judicially observe, in this connection, that gasoline is a motive fluid in general public use... and that there is nothing inherently dangerous in its ordinary use, removal, or carriage, as is attested by the thousands of gasoline vehicles in daily use in the state, as the prime means of transportation and travel. The danger arises, not from its use in the ordinary transportation, but from its negligent use or misuse, in a dangerous environment. [Sarno v. Gulf Refining Co., 99 N.J.L. 340, 342, 124 A. 145 (Sup.Ct.1924), aff'd., 102 N.J.L. 223, 130 A. 919 (E. & A.1925).]
Given the age of the Sarno decision, it is worth revisiting whether today's scientific knowledge regarding potential health risks of gasoline storage requires reclassification of the activity as abnormally dangerous. Since Sarno, a handful of unpublished opinions have tackled the issue. In DeAngelo v. Exxon Corp., A-791-98T3 (App.Div. Oct. 15, 1999), the Appellate Division specifically found the storage of gasoline in underground tanks to not be an abnormally dangerous activity. The DeAngelo court noted that the common usage of such tanks, their value to the community, and the lack of any inappropriateness particularly guided such a holding. Id. at 27-28; see also Laezza v. Exxon Co. U.S.A., A-6111-92T5 (App.Div. Sept. 1, 1995), p. 22-23 (affirming trial court's holding that the transfer of gasoline from a trailer to an underground storage tank was not an abnormally dangerous activity). One published New Jersey case did indicate in dicta that the possessor of a pollutant may be subject to strict liability if it escapes into the environment. City of Bridgeton v. B.P. Oil, Inc., 146 N.J.Super. 169, 173-74, 179, 369 A.2d 49 (Law Div.1976) (involving oil leak from a tank).
*338 Given the lack of instruction in this jurisdiction, it is helpful to survey other state courts that have addressed this issue. The majority of jurisdictions deciding this issue have held that gasoline storage and transport is not an ultrahazardous activity deserving of strict liability. For example, the New York Appellate Division held the storage of gasoline does not constitute an ultrahazardous activity for which strict liability for contamination will attach. 750 Old Country Road Realty Corp. v. Exxon Corp., 229 A.D.2d 1034, 645 N.Y.S.2d 186 (1996). In reaching the same conclusion, a Pennsylvania court found, in pertinent part:
[W]e conclude that the operation of underground storage tanks at a gasoline service station is not an abnormally dangerous activity. Gasoline and other petroleum products can be stored and dispensed safely with reasonable care, and the storage of these materials in tanks is a common use and is valuable to a modern society. The location of tanks at a gasoline service station is certainly appropriate and although the harm which may result from a leak may be great, this one factor pales in comparison to the others which point in favor of our ruling that the storage of petroleum products in underground storage tanks is not abnormally dangerous. [Smith v. Weaver, 445 Pa.Super. 461, 665 A.2d 1215, 1220 (Pa.Super.Ct.1995).]
Other state courts have found "no authority supporting the proposition that dispensing gasoline at a service station is an ultrahazardous activity," and thus no reason to extend the doctrine to reach such an activity. Walcott v. Total Petroleum, Inc., 964 P.2d 609 (Colo.Ct.App.1998); see also Parks Hiway Enterprises, LLC v. CEM Leasing, Inc., 995 P.2d 657 (Alaska 2000) (supply and storage of gasoline is ultrahazardous only in respect to its inherent volatility, not with regard to its potential for environmental damage); French Putnam LLC v. County Envtl. Servs., Inc., 27 Conn.L.Rptr. 684, 2000 WL 1172341 (Connecticut courts split as to whether the storage of gasoline in underground tanks and pumps is an abnormally dangerous activity where gasoline has leaked and contaminated neighboring property and water supplies).
A minority of state courts have held that gasoline storage can be an ultrahazardous activity deserving of strict liability. In Yommer v. McKenzie, 255 Md. 220, 257 A.2d 138, 141 (1969), the Maryland Supreme Court found that the storage of large quantities of gasoline adjacent to a private residence relieved the plaintiff from having to demonstrate negligence. Similarly, the U.S. District Court for the District of Colorado, relying in part on Yommer, held that the Colorado Supreme Court would likely impose strict liability for storage of large amounts of gasoline in a residential area. City of Northglenn v. Chevron U.S.A., Inc., 519 F.Supp. 515, 516 (D.Colo.1981); see also Siegler v. Kuhlman, 81 Wash.2d 448, 502 P.2d 1181 (1972).
In the instant matter, the overwhelming strength of authority and a common sense application of the Restatement mandate the conclusion that the storage and transportation of gasoline does not qualify as an ultrahazardous activity. The abnormally dangerous activity doctrine emphasizes the dangerousness and inappropriateness of the activity. The genesis of the doctrine was a desire to attribute costs to those who benefit from introducing an extraordinary risk of harm into the community. T & E Indus., 123 N.J. at 386-87, 587 A.2d 1249 (citations omitted). The court finds that due consideration of the factors laid out in the Restatement supports this finding. With respect to factors *339 (a) and (c), there is no evidence before the court that convincingly establishes a high risk of great harm if gasoline is transported in an appropriate fashion and stored properly. It is true that gasoline leaking from an underground tank can cause harm to the environment and individuals living near the vicinity of the pollution. After years of correcting environmental abuse, we know that it is expensive and difficult, if not impossible, to restore land to its pre-pollution state. Nevertheless, until practical, alternative means of transportation are readily available to society, the value to the community of having gasoline stations carry on their activities outweighs the dangerous attributes. As the Sarno court, supra, found, over seventy five years ago, the strength of which is not diluted today, even with society's enhanced concern for the safety of the environment: "The danger arises, not from [gasoline's] use in the ordinary transportation, but from its negligent use or misuse, in a dangerous environment." 99 N.J.L. at 342, 124 A. 145. Any dangers posed by gasoline storage or transportation can thus be eliminated through the exercise of reasonable care. In accordance with these findings, with regard to factor (b) the court is unable to find any attendant likelihood that great harm would result from these activities. An analysis of factors (d), (e), and (f) lends further support to the conclusion that the conduct in question should not be identified as ultrahazardous. The use, transportation, and storage of gasoline is unquestionably common, appropriate, and of great value to the community, as evidenced by the fact that a large segment of society is in some manner dependent on automotive travel. Consideration of these Restatement factors weighs heavily against classification as abnormally dangerous.
The court is also persuaded by the strength of reasoning, adopted by the majority of extrajurisdictional courts that decided the issue and concluded that gasoline storage and transportation is not ultrahazardous. The court finds the Bridgeton case, supra, which appears to hold otherwise, to be unpersuasive and inapplicable. Further, the court finds those extrajurisdictional decisions maintaining the minority position to also be unpersuasive, and notes that they are largely significantly older cases than those cited in support of the majority position.[4] The court thus joins in the reasoning and conclusions of those courts that have found that the storage and delivery of gasoline is not an ultrahazardous activity. Stem Brothers is therefore entitled to summary judgment with respect to any and all strict liability claims asserted against it under this theory.
Accordingly, Stem Brothers' motion for summary judgment is GRANTED IN PART and DENIED IN PART in accordance with this opinion.
NOTES
[1] MTBE was used as a fuel additive to comply with the 1990 Clean Air Act Amendments. It is capable of traveling rapidly through soil when leaked. Studies suggest that ingesting MTBE may cause gastrointestinal irritation, liver and kidney damage, and nervous system defects. Animal studies have found that breathing MTBE for long periods may cause kidney and liver cancer.
[2] Defendant maintains that the installation of underground tanks constitutes an improvement to real property. The court might tend to agree in the instance of the initial installation of underground fuel tanks on property previously not used for the retail sale of motor fuel. Nevertheless, the court does not offer an opinion as to whether such a circumstance would qualify as an "improvement to real property" under N.J.S.A. 2A:14-1.1, as it is not necessary to decide that issue for purposes of this motion. However, the court recognizes that such a factual scenario is distinct from that presented in the instant case.
[3] It should be noted that the Ventron case went on to conclude that mercury and other toxic wastes are abnormally dangerous and that disposal of these substances, past or present, is an abnormally dangerous activity. 94 N.J. at 492-93, 468 A.2d 150. The parties in Ventron were at all times engaged in dumping toxic mercury. Clearly such conduct differs from the factual scenario with which the court is now faced.
[4] With the obvious exception of Sarno, of course. 99 N.J.L. at 342, 124 A. 145. In addition, the strength of authority that this court can afford to the Northglenn case appears to be diminished by the more recent appellate court decision in Walcott, discussed above. 964 P.2d 609.