587 A.2d 1249

T & E INDUSTRIES, INC., PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. SAFETY LIGHT CORPORATION; USR INDUSTRIES, INC.; USR LIGHTING, INC.; USR METALS, INC.; USR CHEMICALS INC.; AND US NATURAL RESOURCES, INC., DEFENDANTS–APPELLANTS AND CROSS–RESPONDENTS.

Argued March 12, 1990—Decided March 27, 1991.

372

374

*Albert G. Besser* argued the cause for appellants and cross-respondents (*Hannoch Weisman*, attorneys, *Albert G. Besser, Kevin J. Bruno*, and *Brad R. Roth*, on the briefs).

*Edward A. Zunz, Jr.*, argued the cause for respondent and cross-appellant (*Riker, Danzig, Scherer, Hyland & Perretti*, attorneys, *Edward A. Zunz, Jr., Stuart M. Lederman*, and *Robert J. Gilson*, on the briefs).

The opinion of the Court was delivered by

CLIFFORD, J.

This appeal takes us once again over the unsettled waters of toxic-tort litigation. See, *e.g.*, *Report of the Supreme Court Committee on Environmental Litigation* 10 (1990) (pointing out the unavoidably-complex nature of environmental law and regulation). At the storm center of this case is a radium-contaminated site that is now owned by plaintiff, T & E Industries, Inc. (T & E), but was once owned by United States Radium Corporation (USRC), the predecessor corporation of all the defendant corporations. The primary issue is whether an owner of radium-contaminated property can hold a distant predecessor in title that is responsible for the contamination strictly liable for damages caused by its abnormally-dangerous activity.

We hold that it can. We address as well several questions concerning damages.

## I

## A

Until 1943 USRC owned an industrial site on Alden Street in Orange. From around 1917 to 1926 it processed radium at that site. It extracted the radium from carnotite ore, which had been transported to USRC's plant from Utah and Colorado. USRC sold the radium for medical purposes and also used it to manufacture luminous paint for instrument dials, watches, and other products. It could, however, recover successfully only eighty percent of the radium from the ore. The unextracted radium was contained in "tailings," the solid by-products of the extraction process, which USRC discarded onto the unimproved portions of the Alden Street site.

Carnotite ore consists primarily of Uranium 238, radium, and vanadium. As the nucleus disintegrates, Uranium 238 decays into other elements, one of which is Radium 226. In turn Radium 226 emits gamma rays and decays into Radon 222, which is a naturally-occurring radioactive gas. Radon then decays into radon progeny or radon "daughters," which can adhere to walls, ceilings, dust particles, and, if inhaled, the tissue of the lungs. Gamma-ray exposure can cause bone cancer and leukemia, while radon inhalation can cause lung cancer.

It was not until the mid–1950s, however, that the scientific community engaged in any serious study of the epidemiological risks associated with radon. It did not generally accept the link between radon and lung cancer until the 1960s, and it was not aware of the problems generated by radioactive tailings until the late 1960s. The federal government, reflecting an unfortunate lag time, did not regulate the disposition of tailings until 1978.

Nevertheless, both the scientific community and USRC had suspicions about the hazards of radium at a much earlier date. In 1917 Florence Wall, an employee of USRC, calculated the amount of radium extracted from ore and measured its radioactivity. A graduate of Saint Elizabeth's College, Wall testified that she had learned very early that she should not touch radium and that she should wear protective clothing. For protection at work she wore a full-length lead-lined apron, much like a "mummy case."

Others too were concerned about handling radium. Wall recalled an incident involving Dr. Von Sochocky, the president of USRC, when radium lodged beneath his fingernail: he immediately "hacked" off his fingertip because he feared the effects of radium.

Another USRC employee, Gordon Cameron, who worked for the company from 1923 to 1926, extracted radium from the ore and removed the tailings from the plant. At work Cameron wore a rubber apron, rubber gloves, and rubber shoes. He also used rubber pails to carry the tailings. According to Cameron, he took those precautions primarily for protection from the harsh chemicals used in the extraction process, but he knew enough about the health hazards of radium "to keep away from it as much as possible."

In the early 1920s, USRC acquired still more evidence of the dangers of radium. Some of its employees applied the luminous paint to watch and instrument dials. After dipping their brushes into the paint, the dial-painters often sharpened the tip of the brush in their mouths, thereby ingesting a small amount of radium. Many of those employees eventually developed cancer. After discovering the problems associated with ingesting radium, USRC posted warnings cautioning its employees against sharpening the brushes in that fashion.

Radium processing at the Orange facility ceased in 1926, and USRC vacated the premises. Despite USRC's departure from Orange, the company retained ownership of that site and con-

tinued to produce fluorescent compounds, albeit in New York. In the mid–1930s USRC leased the premises to various commercial tenants, eventually selling the property to one of those tenants in 1943. During that interim, the risks posed by radium became increasingly apparent.

In 1932 there appeared in the American Journal of Cancer an article entitled "Cancer of the Lung in the Miners of the Jackymon," which dealt with the dangers of inhaling radon. Eight years later Drs. Evans and Goodman, two experts in the field of radiation, published an article entitled "Determination of the Thoron Content of Air and its Bearing on Lung Cancer Hazards in Industry," concerning radon and lung cancer. That article discussed how the refining of radioactive material produces radon. The authors reported that the inhalation of the gas is "known to be hazardous." Because of those hazards, they recommended that exposure to radon be limited.

In 1941 the U.S. Department of Commerce published a handbook (H–27) entitled "Safe Handling of Radioactive Luminous Compound." That handbook included detailed information on the effects of ingestion or inhalation of solid radioactive luminous compound, on the results of inhalation of radon liberated from compound into the air, and on the consequences of exposure of the whole body to gamma radiation. According to the handbook, "[t]he continued inhalation of radon may produce carcinoma of the lungs." Recognizing that "serious injury and even death may result from the injudicious handling of [radioactive luminous] compound[s]," the handbook provided safety guidelines for the handling of such materials, and concluded that radon concentration in the workplace atmosphere must be limited. The participation of J.E. Paul, a representative from USRC, on the advisory committee that prepared the materials for the handbook suggests that USRC was aware of that publication's conclusions.

In a 1943 letter to the War Department the president of USRC, seeking to renegotiate a government contract, likewise

demonstrated knowledge of radium and radon hazards. Although he contended that "there is no exact formula by which it can be determined how much injury might be caused by any given amount of non-continuous exposure [to radioactive materials]," he admitted that "a hazard does exist." To support that conclusion, the letter referred to several case studies involving USRC employees. In each case the employee's death was attributed to radium exposure: some had inhaled radon, some had been exposed to gamma radiation, and some had suffered from the effects of both radon inhalation and gamma-ray exposure.

In that same year, 1943, USRC sold the Orange property to Arpin, a plastics manufacturer. Despite its suspicions about the harmful effects of radium, as recited above, USRC did not remove the discarded tailings from the site.

Arpin, unaware of the potential risks associated with the tailings, added to the plant a new section that rested on the discarded tailings. Since then the property has changed hands several times. Plaintiff, T & E, a manufacturer of electronic components, began leasing the premises in 1969 and purchased it in 1974.

B

The Uranium Mill Tailings Radiation Control Act, 42 U.S.C. § 7901 to § 7942 (1978), calls for the evaluation of inactive mill-tailing sites. In accordance with that Act, Jeanette Eng, a supervisor in the New Jersey Department of Environmental Protection (DEP), visited plaintiff's plant in March 1979. She found elevated gamma-radiation levels inside the building, on the vacant property behind the building, and in the parking lot.

Tests on air and soil samples verified that the levels of radon, radon progeny, and gamma radiation exceeded State regulations. The radon level of the soil samples taken from beneath the building exceeded federal standards as well. The most severe problem existed in the oven room, the portion of the

building added by Arpin. DEP instructed plaintiff "to begin immediate remedial action." It also informed plaintiff that such remedial action would serve only as an interim measure. DEP suggested that if funding for a full decontamination of the site could not be found quickly, plaintiff's options would be "limited to undertaking the cost of decontamination or consider[ing] abandoning the site."

In response to DEP's recommendations, plaintiff restricted employee access to the oven room and monitored the use of that room. It also retained a health physicist, Dr. Steidley, as a consultant. After confirming the State's findings, Steidley recommended that plaintiff seal all cracks, expansion joints, and drains in the oven room, and install fans to ventilate the plant. Steidley concluded, however, that decontamination of the site would ultimately require removal of the soil from beneath and around the building. Short of removing the soil, plaintiff complied with all of Steidley's recommendations.

Despite plaintiff's interim efforts, in 1981 the Environmental Protection Agency (EPA), at DEP's request, placed the property on the National Priorities List, consisting of those sites posing the most significant potential threats to human health because of their known or suspected toxicity. See 42 *U.S.C.* § 9605(8)(B) (1980) (current version at § 9605(a)(8)(B) (1986)). Although DEP did not order plaintiff to abandon the site, T & E moved its operations to another building in Orange and closed the Alden Street plant. Under the Environmental Cleanup and Responsibility Act (ECRA), *N.J.S.A.* 13:1K–6 to –13, T & E cannot sell the property until cleanup has been effected. *See N.J.S.A.* 13:1K–9 to –13.

C

In March 1981 T & E sued Safety Light Corporation; USR Industries; USR Chemical Products, Inc.; USR Lighting Products, Inc.; USR Metals, Inc.; U.S. Natural Resources, Inc.; GAF Corporation; and Mitsubishi Chemical Industries, all suc-

cessor corporations of USRC. The suit is based on nuisance, negligence, misrepresentation and fraud, and strict liability for an abnormally-dangerous activity. The trial court ordered separate trials and designated Safety Light Corporation as the defendant in the first trial. Thereafter the other defendants stipulated that any damages awarded against Safety Light would be binding on any defendant found liable in the second trial. "Defendant" as used hereafter in this opinion refers to Safety Light.

Finding that USRC had "placed hazardous wastes in the form of radium ore tailings" on the Alden Street property in Orange, the court granted plaintiff's motion for partial summary judgment. The court then denied defendant's motion for summary judgment on the strict-liability claim, holding that "as a matter of law, the principle of strict liability is applicable to a former owner of premises depositing thereon 'abnormally dangerous' substance(s) in an amount dangerous to health in an action against the former owner by a successor in title thereto unaware of the presence of the solid substance." It also ruled that radium is a *per se* "abnormally dangerous" substance "within the meaning of *State v. Ventron*, 94 *N.J.* 473, 468 *A.*2d 150 (1983), and the *Restatement (Second) of Torts* § 520 (1977), and that the depositing of the same in an amount dangerous to health and life is an 'abnormally dangerous activity' within the meaning of [those authorities]."

At trial plaintiff claimed that several factors had prompted the move from the Alden Street site: the perceived health threat posed by the contaminated site, the emotional welfare of employees, a possible increase in worker's compensation insurance costs, and the prospect of the State's compelling such a move.

The trial produced a spirited debate between the experts over the health risks from radiation exposure. Steidley, plaintiff's consultant and expert, surmised that as the amount of radiation exposure increases, health risks also increase. To support that

theory Steidley referred to an EPA statement, suggesting that "there is some finite risk to humans no matter how small the amount of absorbed radiation and that the risk at any given low level is directly proportional to the damages demonstrated at higher doses." He conceded, however, that empirical data have not been developed to validate that theory.

Defendant's expert, Dr. Auxier, challenged plaintiff's theory, contending that although it might have a legitimate use in the promulgation of health standards, it should not be used to predict actual risk. Although he admitted that the radioactivity of the site exceeded regulatory standards, Dr. Auxier insisted that T & E employees had not been exposed to a health hazard. He premised that conclusion on his belief that "the dose levels to which [T & E employees] have been or would be exposed on that site are less than those doses which large populations have gotten over many years and no harm has been evidenced."

When plaintiff's case concluded, the court reversed itself and granted defendant's motion to dismiss plaintiff's strict-liability claims. It ruled that strict liability arising from an abnormally-dangerous activity may be imposed only if the defendant knew at the time of performance that its activity was in fact abnormally dangerous. The court concluded that the scientific community had no knowledge of the danger when USRC disposed of the tailings. It also dismissed plaintiff's claims for fraud and misrepresentation and for punitive damages, allowing the case to proceed only on the negligence count.

At the close of the case defendant moved to dismiss the negligence claim, asserting that USRC had had no duty to warn purchasers about the dangerous tailings. Reserving decision on that motion, the court submitted the negligence claim to the jury. It instructed the jury to determine whether USRC had negligently failed to warn the purchaser (Arpin) in 1943 about the dangerous nature of the tailings, and whether USRC had negligently failed to warn T & E about those dangers prior to plaintiff's purchase in 1974. The jury found defendant not

negligent in the 1943 sale but negligent in respect of the 1974 transaction. The court then granted judgment n.o.v. in favor of all defendants, ruling that the doctrine of *caveat emptor* barred plaintiff's recovery. The Appellate Division granted leave to appeal and reversed. *T & E Indus. v. Safety Light Corp.*, 227 *N.J.Super.* 228, 546 *A.*2d 570 (1988).

Relying primarily on *State, Department of Environmental Protection v. Ventron Corporation*, 94 *N.J.* 473, 468 *A.*2d 150 (1983) (*Ventron*), and *Restatement (Second) of Torts, supra*, § 519, the court below observed that "handling toxic waste is an abnormally dangerous activity." 227 *N.J.Super.* at 239, 546 *A.*2d 570. Thus, it concluded that "the processing of radium and the disposal of its waste product is an abnormally dangerous activity as a matter of law." *Id.* at 240, 546 *A.*2d 570. Because USRC had " 'introduce[d] an unusual danger into the community,' it could be held strictly liable for the damages caused." *Id.* at 241, 546 *A.*2d 570 (quoting *Berg v. Reaction Motors*, 37 *N.J.* 396, 410, 181 *A.*2d 487 (1962)).

The Appellate Division also rejected the contention that strict liability applies only to interference with the property rights of a neighbor, not those of a successor in title. It concluded that there is "no practical or legal distinction between the rights of a successor in title to use and enjoy its land and the rights of a neighboring property owner. Both have rights and both can suffer injury through the acts of a prior owner." 227 *N.J.Super.* at 241, 546 *A.*2d 570.

Nor did the court below believe that the doctrine of *caveat emptor* insulated defendant from liability. Finding that doctrine outdated, the Appellate Division concluded that a "party who creates [an abnormally-dangerous] condition is absolutely liable and cannot avoid that responsibility unless a purchaser knowingly accepts that burden." *Id.* at 242, 546 *A.*2d 570. It also perceived that considerations of reasonableness, fairness, and public policy dictate that "[w]henever possible, the party responsible for creating the toxic waste hazard should be the

party responsible for the clean-up of that hazard, whether or not that damage was foreseeable at the time the hazard was created." *Id.* at 244, 546 *A.*2d 570.

We granted defendant's petition for certification, 117 *N.J.* 118, 564 *A.*2d 848 (1989), as well as plaintiff's cross-petition on the issue of damages, 117 *N.J.* 119, 564 *A.*2d 848 (1989).

## II

### A

At the outset we must determine whether a property owner can assert against a predecessor in title a cause of action sounding in strict liability for abnormally-dangerous activities. Defendant suggests that only neighboring property owners, not successors in title, can maintain such a suit, and that successors in title must rely on contract law to recover from a prior owner. According to defendant, a wealth of case law, including the Third Circuit decision in *Philadelphia Electric Co. v. Hercules, Inc.*, 762 *F.*2d 303 (1985), and the historical development of the abnormally-dangerous-activity doctrine support that distinction.

In *Philadelphia Electric Co.* the court considered whether a property owner could recover damages for toxic-waste contamination from its predecessor in title. Relying on the doctrine of *caveat emptor* and the historical role of private-nuisance law, the court concluded that the property owner could not bring a private-nuisance claim against its former owner and could not recover damages. *Id.* at 312.

In reaching that conclusion, the court explained the traditional view of a seller's liability:

"Under the ancient doctrine of *caveat emptor*, the original rule was that, in the absence of express agreement, the vendor of land was not liable to his vendee, or *a fortiori* to any other person, for the condition of the land existing at the time of transfer. As to sales of land this rule has retained much of its original force, and the implied warrantees which have grown up around the sale of chattels never have developed. This is perhaps because great importance always has been attached to the deed of conveyance, which is taken to represent the full agreement of the parties, and to exclude all other terms and

liabilities. The vendee is required to make his own inspection of the premises, and the vendor is not responsible to him for their defective condition, existing at the time of transfer." [*Id.* at 312 (quoting Reporter's Note to *Restatement (Second) of Torts* § 352 (1965)).]

According to the court, the exceptions to the rule of *caveat emptor* that had developed in Pennsylvania were based on the inequality of bargaining power that prevailed between a home buyer and a builder-seller. Because the *Philadelphia Electric Co.* case involved two corporations with essentially equal resources, the facts did not fit within the rationale for an exception to the rule.

Furthermore, the court did not accept the notion that a successor in title could escape the force of *caveat emptor* by resort to a private-nuisance theory as a basis for imposing liability on a former owner. Historically, private-nuisance law resolved disputes between neighboring property owners over contemporaneous land uses. It did not cover "conditions existing on the very land transferred." *Id.* at 313. Because the dispute concerned the condition of the property sold, the court concluded that the successor in title could not ground its claim on a private-nuisance theory.

Drawing from the rationale of the *Philadelphia Electric Co.* opinion, defendant argues that we should adopt a similar analysis. Defendant stresses that a successor in title, unlike an innocent neighbor, could have inspected the property or demanded a warranty deed. We are not persuaded, however, that a landowner who engages in abnormally-dangerous activities should be liable only to neighboring property owners.

We recently chronicled the development of the abnormally-dangerous-activity doctrine in *Ventron, supra,* 94 *N.J.* at 487–92, 468 *A.*2d 150. The concept of imposing liability on a landowner who engages in an abnormally-dangerous activity evolved essentially to complement the existing "system for redressing unlawful interference with a landowner's right to possession and quiet enjoyment of his land." *Id.* at 488, 468 *A.*2d 150. During the nineteenth century the narrowly-defined

theories of trespass and nuisance did not adequately protect a landowner's property rights. *Id.* at 488–89, 468 *A.*2d 150. Trespass applied only to actual invasions of the plaintiff's property that resulted directly from the defendant's activity, while nuisance covered activities on the defendant's property that continually interfered with the plaintiff's enjoyment and possession of land. *Id.* at 489, 468 *A.*2d 150. Neither cause of action pertained to non-continual activity on the defendant's property that indirectly interfered with the plaintiff's property rights. The doctrine of strict liability for abnormally-dangerous activities developed primarily to fill that gap.

Beginning with the English case of *Rylands v. Fletcher, L.R.* 1 *Ex.* 265 (1866), *aff'd, L.R.* 3 *H.L.* 330 (1868), which involved damage to the plaintiff's coal mine caused by the escape of water from a mill-owner's reservoir, courts more readily recognized that a defendant who engages in unduly-dangerous or geographically-inappropriate activities should be held liable to others for damages flowing from that activity. The rule applied despite the absence of an actual invasion directly resulting from a defendant's act (trespass) and continual interference with a plaintiff's property interest (nuisance).

Although the rule grew out of a need to fill a void in the law governing the rights of adjacent landowners, another thread woven into its rationale justifies much broader application. *See* Comment, "The Rylands v. Fletcher Doctrine in America: Abnormally Dangerous, Ultra-hazardous or Absolute Nuisance?", 1978 *Ariz.St.L.J.* 99, 105 (doctrine should not be limited to adjacent-landowner situations). The abnormally-dangerous-activity doctrine emphasizes the dangerousness and inappropriateness of the activity. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on The Law of Torts* § 78, 551 (5th ed. 1984) (hereinafter *Prosser* ). Despite the social utility of the activity, that doctrine imposes liability on those who, for their own benefit, introduce an extraordinary

risk of harm into the community. *Id.* at 555; *Berg v. Reaction Motors, supra,* 37 *N.J.* at 412, 181 *A.*2d 487.

The rule reflects a policy determination that such "enterprise[s] should bear the costs of accidents attributable to highly dangerous [or unusual activities]." *Prosser, supra,* at 555. Because some conditions and activities can be so hazardous and of "such relative infrequent occurrence," the risk of loss is justifiably allocated as a cost of business to the enterpriser who engages in such conduct. *Id.* at 556; *see Berg v. Reaction Motors, supra,* 37 *N.J.* at 410, 181 *A.*2d 487; *Kenney v. Scientific, Inc.,* 204 *N.J.Super.* 228, 248, 497 *A.*2d 1310 (Law Div.1985). Although the law will tolerate the hazardous activity, the enterpriser must pay its way. *Berg v. Reaction Motors, supra,* 37 *N.J.* at 410, 181 *A.*2d 487.

The rule recognizes an additional policy consideration: such enterprises are in "a better position to administer the unusual risk by passing it onto the public." *Prosser, supra,* § 75, at 537. Because of that opportunity, the enterprise can better bear the loss.

Neither policy rests on notions of property rights. Rather, the first serves to induce certain businesses to "internalize" the external costs of business, while the second seeks to shift a seemingly-inevitable loss onto the party deemed best able to shoulder it. Because the former owner of the property whose activities caused the hazard might have been in the best position to bear or spread the loss, liability for the harm caused by abnormally-dangerous activities does not necessarily cease with the transfer of property.

 Nor are we satisfied that the doctrine of *caveat emptor* as developed in New Jersey should bar plaintiff's cause of action. Although the principle of *caveat emptor* dictates that in the absence of express agreement, a seller is not liable to the buyer or others for the condition of the land existing at the time of transfer, *Restatement (Second) of Torts, supra,* § 352 comment (a); *see also Levy v. Young Constr. Co.,* 46 *N.J.Su-*

*per.* 293, 297, 134 *A.*2d 717 (App.Div.1957) (absent fraud, concealment, or express warranty in deed, seller not liable to buyers for damages resulting from defects in premises), *aff'd,* 26 *N.J.* 330, 139 *A.*2d 738 (1958), there are recognized exceptions to the rule. For instance, the seller who conceals or fails to disclose any condition that involves an unreasonable risk to others can be held liable to a buyer who had no reason to know of the undisclosed condition or risk if the seller knew or should have known of the condition or risk as well as of the likelihood the buyer would not discover that condition or risk. *Restatement (Second) of Torts, supra,* § 353; *see Sarnicandro v. Lake Developers,* 55 *N.J.Super.* 475, 481–83, 151 *A.*2d 48 (App. Div.1959); *see also O'Connor v. Altus,* 67 *N.J.* 106, 114, 335 *A.*2d 545 (1975) (limits of liability considered); *Prosser, supra,* § 64, at 447.

Moreover, the rule of *caveat emptor* has not retained its original vitality. With time, and in differing contexts, we have on many occasions questioned the justification for the rule. See, *e.g., Henningsen v. Bloomfield Motors, Inc.,* 32 *N.J.* 358, 161 *A.*2d 69 (1960) (purchase of defective automobile); *Santor v. A & M Karagheusian,* 44 *N.J.* 52, 207 *A.*2d 305 (1965) (recovery of costs for defective rug); *Schipper v. Levitt & Sons, Inc.,* 44 *N.J.* 70, 207 *A.*2d 314 (1965) (purchase of new home from mass-developer); *Reste Realty Corp. v. Cooper,* 53 *N.J.* 444, 251 *A.*2d 268 (1969) (rental of residential property); *McDonald v. Mianecki,* 79 *N.J.* 275, 398 *A.*2d 1283 (1979) (purchase of new home from small-scale developer). In each instance we were persuaded that notions of equity precluded application of the rule. For example, in *Santor* we considered whether the plaintiff could recover the costs of a defectively-manufactured rug. Concluding that contract principles such as a lack of privity should not bar recovery, the Court remarked that

the obligation of the manufacturer thus becomes what in justice it ought to be—an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The purpose of such liability is to insure that the cost of

injuries or damage, either to the goods sold or to other property, resulting from defective products is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves. [44 *N.J.* at 65, 207 *A.*2d 305.]

That rationale would appear to apply with equal force in the context of a real-estate transaction in which the responsibility for a defective condition is not covered in the agreement. Unlike the Pennsylvania courts, our courts have not premised the erosion of the doctrine of *caveat emptor* in the sale of realty solely on the inequality of bargaining power between the buyer and builder-seller. In *McDonald v. Mianecki, supra,* 79 *N.J.* at 284–85, 398 *A.*2d 1283, we recognized the anomalous distinctions drawn between sales of personalty and of realty. Although we relied heavily on inequality of bargaining power to justify the buyer's recovery, we also indicated that the builder-seller is "in a better position to prevent the *occurrence* of major problems." *Id.* at 288, 398 *A.*2d 1283. Allowing the buyer's recovery would "plac[e] liability on the party responsible for placing the defective article in the stream of commerce and encourage more careful and thorough building practices." *Id.* at 297, 398 *A.*2d 1283.

The same rationale is just as, if not more, persuasive when a seller who has engaged in an abnormally-dangerous activity and disposed of the by-products of that activity onto the property markets the land. With knowledge of its activity and of its use of the land, the seller is in a better position to prevent future problems arising from its use of the property. And again, allowing a buyer to recover would place liability on the party responsible for creating the hazardous condition and marketing the contaminated land. Moreover, in many respects that rationale echoes the underlying policy of the abnormally-dangerous-activity doctrine: certain enterprises should bear the costs attributable to their activities. *See Berg v. Reaction Motors, supra,* 37 *N.J.* at 410, 181 *A.*2d 487; *Kenney v. Scientific, Inc., supra,* 204 *N.J.Super.* at 248, 497 *A.*2d 1310.

 Defendant complains that holding a predecessor in title strictly liable for its abnormally-dangerous activities "would destroy the real estate market." Not likely. A buyer can assume the risk of harm from an abnormally-dangerous activity. *Restatement (Second) of Torts, supra,* § 523. To do so a buyer need only knowingly and voluntarily encounter the risk. *Cf. Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 158, 406 *A.*2d 140 (1979) (application of a similar principle in products-liability context). "As is" contracts, such as those involved here, do not satisfy that standard. Surely "a party[ ] ignorant of the presence of an abnormally dangerous condition [cannot] be held to have contractually assumed the risk posed by that condition merely by signing an 'as is' purchase contract." *Amland Properties Corp. v. Aluminum Co. of Am.,* 711 *F.Supp.* 784, 803 n. 20 (D.N.J.1989). A real-estate contract that does not disclose the abnormally-dangerous condition or activity does not shield from liability the seller who created that condition or engaged in that activity.

## B

We focus now on the elements of the abnormally-dangerous-activity doctrine. That doctrine is premised on the principle that "one who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." *Restatement (Second) of Torts, supra,* § 519. The *Restatement* sets forth six factors that a court should consider in determining whether an activity is "abnormally dangerous." They are:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes. [*Restatement (Second) of Torts, supra,* § 520.]

■■■■■■■ In *Ventron,* this Court concluded, after applying the foregoing factors, that "mercury and other toxic wastes are 'abnormally dangerous,' and the disposal of them past or present, is an abnormally dangerous activity." 94 *N.J.* at 493, 468 *A.*2d 150. As *Ventron* makes clear, "[u]nder *Restatement* analysis, whether an activity is abnormally dangerous is to be determined on a case-by-case basis, taking all relevant circumstances into consideration." *Id.* at 491, 468 *A.*2d 150. That proposition is consistent with the *Restatement,* which cautions against *per se* rulings. *See Restatement (Second) of Torts, supra,* § 520 comment f ("In determining whether the danger is abnormal, the factors listed in Clauses (a) to (f) * * * are all to be considered, and are all of importance. Because of the interplay of [those] factors, it is not possible to reduce abnormally dangerous activities to any definition."). Thus, a court must make the determination about the abnormally-dangerous character of an activity one case at a time. The Appellate Division failed to observe that mandate in this case and consequently gave *Ventron* too broad a reading in concluding that "the processing of radium and the disposal of its waste product is an abnormally dangerous activity *as a matter of law.*" 227 *N.J.Super.* at 240, 546 *A.*2d 570 (emphasis added).

Defendant does not dispute that liability can be imposed on enterprisers who engage in abnormally-dangerous activities that harm others; but it contends that such liability is contingent on proof that the enterpriser knew or should have known of the "abnormally dangerous character of the activity." According to defendant, absent such knowledge the enterpriser "is in no position to make the cost-benefit calculations that will enable him to spread the risk and engage in the optimal level of activity." Defendant argues that absent such an opportunity, the policy basis for imposing strict liability on those who engage in abnormally-dangerous activities, namely, cost spreading, cannot be realized.

Defendant adds that knowledge, or the ability to acquire such knowledge, must be assessed as of the time the enterpriser

engaged in the activity, not at a later time—that is, if the risk of harm from the activity was scientifically unknowable at that time, an enterpriser should not be held liable. Defendant also insists that the inquiry must focus on the enterpriser's ability to learn of the risks inherent in the precise activity that causes harm, not merely of the hazards inherent in the business in general. Thus, defendant stresses that strict liability should be imposed in this case only if USRC knew in 1926 of the specific dangers inherent in the discarded tailings, not simply of those associated with the processing and handling of radium.

Defendant's argument poses an interesting question concerning the availability of a state-of-the-art defense—that is, the risk of the activity was scientifically unknowable at the time— to a strict-liability claim for abnormally-dangerous activities. It is a question we need not resolve here, however, because state-of-the-art becomes an issue only if we agree that knowledge is a prerequisite for strict-liability claims *and* if we accept defendant's narrow view of the "knowledge" inquiry.

Few cases discuss specifically the requisite state of mind for those who engage in abnormally-dangerous activities. See, *e.g.*, *Garcia v. Estate of Norton*, 183 *Cal.App.*3d 413, 420, 228 *Cal.Rptr.* 108, 112 (1986) (defendant need not have "actual knowledge of the true extent of the danger involved in proceeding with an ultrahazardous activity"). Some commentators propose that the *Restatement* standards for abnormally-dangerous activities imply that the risk be foreseeable. *See, e.g.*, Zazzali & Grad, "Hazardous Wastes: New Rights and Remedies? The Report and Recommendations of the Superfund Study Group," 13 *Seton Hall L. Rev.* 446, 462 (1983) ("The *Restatement (Second)* formula of strict liability, adopting an abnormally dangerous activity test, requires a balancing of numerous factors such as the utility of the activity, foreseeability of harm, and the appropriateness of the locale of the activity."); Ginsberg & Weiss, "Common Law Liability for Toxic Torts: A Phantom Remedy," 9 *Hofstra L.Rev.* 859, 918 (1981) (both versions of *Restatement* include foreseeability re-

quirement); Comment, "Absolute Liability for Ultrahazardous Activities: An Appraisal of the Restatement Doctrine," 37 *Calif.L.Rev.* 269, 272 (1969) (hereinafter Comment, "Absolute Liability") (*Restatement* impliedly requires foreseeability of risk). One author suggests that foreseeability of the risk is "a necessary element in any adequate absolute liability doctrine." Comment, "Absolute Liability," *supra,* 37 *Calif.L.Rev.* at 275.

But requirements such as "knowledge" and "foreseeability" smack of negligence and may be inappropriate in the realm of strict liability. *See* Special Report to Congress, "Injuries And Damages From Hazardous Wastes—Analysis And Improvement of Legal Remedies, In Compliance With Section 301(c) Of The Comprehensive Environmental Response Compensation And Liability Act of 1980 By The 'Superfund Section 301(e) Study Group'" Vols. I & II, __ to __ (*reprinted as* Comm. Print for the Senate Comm. on Envtl. & Pub. Works, Serial No. 97–12, 97th Cong., 2d Sess., 1982) ("Whenever a balancing of factors is required under a strict liability theory, a notion of duty of care, responsibility or fault is easily implied as to choice of location or means and strict liability begins to sound more like negligence.").

We need not, however, determine whether knowledge is a requirement in the context of a strict-liability claim predicated on an abnormally-dangerous activity. Even if the law imposes such a requirement, we are convinced, for the reasons set forth more fully below, that defendant should have known about the risks of its activity, and that its constructive knowledge would fully satisfy any such requirement.

C

That brings us to the question of whether defendant's activity was such as to fall within the meaning of "abnormally-dangerous activity." As indicated above, our opinion in *Ventron, supra,* 94 *N.J.* at 491, 468 *A.*2d 150, instructs that in making

such a determination a court must consider the factors set forth in the *Restatement of Torts*. See *supra* at 390. As in *Ventron*, we apply those factors to the circumstances in this case.

Radium has always been and continues to be an extraordinarily-dangerous substance. Although radium processing has never been a common activity, the injudicious handling, processing, and disposal of radium has for decades caused concern; it has long been suspected of posing a serious threat to the health of those who are exposed to it. See articles and handbook referred to *supra* at 378–379. The harm that can result from excess radium exposure, namely, cancer, is undoubtedly great. In light of those suspicions and the magnitude of the harm, it is not surprising that in the 1930s and 1940s experts concluded that radon exposure should be limited. Wisely, the government now regulates such exposure.

Furthermore, although the risks involved in the processing and disposal of radium might be curtailed, one cannot safely dispose of radium by dumping it onto the vacant portions of an urban lot. Because of the extraordinarily-hazardous nature of radium, the processing and disposal of that substance is particularly inappropriate in an urban setting. We conclude that despite the usefulness of radium, defendant's processing, handling, and disposal of that substance under the facts of this case constituted an abnormally-dangerous activity. Plaintiff's property is befouled with radium because of defendant's abnormally-dangerous activity. Radiation levels at the site exceed those permitted under governmental health regulations. Moreover, the property has been earmarked as a Superfund site. See *supra* at 380. Because plaintiff vacated the premises in response to the health concerns posed by the radium-contaminated site and because the danger to health is "the kind of harm, the possibility of which [made defendant's] activity abnormally dangerous," defendant is strictly liable for the result-

ing harm. *Restatement of Torts, supra,* § 519. Defendant's asserted lack of knowledge cannot relieve it of that liability.

■ Recall that defendant argues that the knowledge required is of the precise dangers associated with the disposal of the tailings, not merely those inherent in the processing and handling of radium. Defendant has not, however, cited any authority that supports such a narrow inquiry, nor do we believe that the focus should be that narrow. ·

■ Here defendant knew that it was processing radium, a substance concededly fraught with hazardous potential. It knew that its employees who handled radium should wear protective clothing; it knew that some employees who had ingested radium had developed cancer; and prior to the sale of the property, it knew that the inhalation of radon could cause lung cancer. Despite that wealth of knowledge concerning the harmful effects of radium exposure, defendant contends that it could not have known that disposal of the radium-saturated by-products behind the plant would produce a hazard. That contention appears to rest on the idea that somehow the radium's potential for harm miraculously disappeared once the material had been deposited in a vacant corner of an urban lot, or at the least that one might reasonably reach that conclusion—a proposition that we do not accept.

Surely someone engaged in a business as riddled with hazards as defendant's demonstrably was should realize the potential for harm in every aspect of that dangerous business. If knowledge be a requirement, defendant knew enough about the abnormally-dangerous character of radium processing to be charged with knowledge of the dangers of disposal.

### III

Finally, we address the issue of damages. At trial plaintiff suggested that damages should include the purchase price of the new building to which it had moved its operations, the cost

of specialized improvements, business-interruption expenses, compensation for time that plaintiff's president had spent on the radon problem, and the cost of maintaining the Alden Street site until cleanup. Plaintiff also sought indemnification for future cleanup costs to be assessed by the government.

The trial court rejected several elements of plaintiff's damage claim. Disagreeing with plaintiff on the appropriate measure of damages, the court refused to allow plaintiff to present proof of the purchase price of the new building or the cost of specialized improvements. Instead, the court ruled that plaintiff could recover only the diminution in value of the Alden Street property, which totalled $225,000. The trial court also rejected the claim for the "cost of the president's time," limited the maintenance costs for the Alden Street site to a six-month period, and dismissed plaintiff's claim for indemnification of future cleanup costs. The damages that the court allowed totalled $372,100.22, the amount of the jury award.

On appeal plaintiff claimed that the trial court had improperly limited damages and had erroneously dismissed the claim for indemnification. Having concluded that defendant was absolutely liable under the abnormally-dangerous-activity doctrine, the Appellate Division remanded the case to the Law Division on the issue of damages, stating that

[s]ince the theory of absolute liability was not presented to the jury for its consideration on the issue of damages, the entire damage award is reversed. In light of our finding of absolute liability, the previous limits on damages would be unduly restrictive at the new trial and therefore, the damages issue must be thoroughly considered absent those limits * * *. [227 N.J.Super. at 244–45, 546 A.2d 570.]

Unsure of the scope of the remand, plaintiff sought clarification. The Appellate Division responded that "[t]he new trial on damages will be all inclusive, addressing both issues of damages from liability concerning cleanup costs as well as other general and specific damages flowing from defendant's liability."

Plaintiff's cross-appeal argues that the Appellate Division should have granted indemnification for future cleanup costs as

a matter of law. It also contends that any remand should be limited to those damages excluded by the trial court, and should not include a retrial of those damages awarded by the jury. Defendant responds that a remand is unnecessary because regardless of which theory of liability, *i.e.*, absolute liability or negligence, applies, the damages remain the same. It also complains that plaintiff's claim for indemnity is premature because the government has not yet compelled cleanup of the site. Moreover, defendant argues that such an award "raises the prospect of a double recovery": first, plaintiff has recovered damages for the diminution in value of the property; then if cleanup costs are awarded, the property will be restored to full value and plaintiff recovers again.

## A

On the indemnity issue defendant makes much of the fact that plaintiff has not yet incurred the expense of cleanup. In that connection we note that in February 1988 the United States District Court entered a judgment declaring defendant "liable for any necessary costs of response incurred and to be incurred by T & E." *T & E Indus., Inc. v. Safety Light Corp.*, 680 *F.Supp.* 696, 709. The fact that plaintiff has not yet incurred cleanup expense, however, is irrelevant when one considers the relief requested. Although plaintiff's claim is couched in terms of indemnification, plaintiff does not argue that it should be indemnified *now* for unexpended cleanup costs. Rather, plaintiff contends that "if T & E is compelled by a governmental body to clean up the site, defendant[ ] should indemnify the plaintiff for that cost." In essence plaintiff seeks declaratory relief determining liability for cleanup costs.

To resolve the appropriateness of such relief, we must first assess whether plaintiff would ultimately be entitled to indemnification. We are satisfied that if plaintiff is compelled to clean up the property, it should be indemnified.

A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct. [*Restatement of Restitutions* § 76 (1937).]

*See also Adler's Quality Bakery v. Gaseteria, Inc.*, 32 *N.J.* 55, 80, 159 *A.*2d 97 (1960) (person who, without fault, has been compelled to pay for negligence of another is entitled to indemnification). As between an unsuspecting purchaser and a seller who has engaged in an abnormally-dangerous activity and polluted the property, the polluter should bear the cleanup expense. *See Ventron, supra,* 94 *N.J.* at 493, 468 *A.*2d 150 ("Those who poison the land must pay for its cure."). Because plaintiff would ultimately be entitled to indemnification, it is entitled now to a declaratory judgment holding defendant liable for any necessary cleanup costs. Thus, plaintiff can recover cleanup costs as they are incurred.

■ Contrary to defendant's assertion, our award of declaratory relief for future cleanup costs does not allow for a double recovery. At trial plaintiff received $225,000, representing the value of the property before the radium contamination rendered it worthless. Plaintiff's real-estate appraiser testified that of that amount, $185,500 reflected the value of the building and lot improvements, while $31,500 represented the value of the land. (The difference between the total of those figures, $217,-000, and the appraiser's $225,000 represents appreciation in the value of the property between the time of the appraisal and the time of trial.) With the declaratory judgment, however, plaintiff recovers cleanup costs. When the property has been decontaminated, it will be restored to full value. Plaintiff will then be able to sell the property at market value. Thus, the declaratory judgment precludes plaintiff from recovering the $31,500 awarded for the diminution in the value of the land. However, assuming that the building and improvements will have to be demolished in the cleanup process, plaintiff can recover the $185,500 representing their value.

## B

On the damages issue, plaintiff contends that only those damages erroneously excluded by the trial court should be considered on remand. Although defendant concedes that those damages awarded by the jury need not be relitigated, it argues that the trial court properly excluded certain elements of damages. According to defendant, plaintiff was not entitled to recover the cost of specialized improvements, compensation for the president's management time, carrying costs for the new facility, and maintenance costs of the contaminated site. Although at oral argument plaintiff acknowledged that it could not recover the cost of a new facility, it insisted that the other damages should have been submitted to the jury.

A plaintiff should be compensated for those losses or injuries proximately caused by a defendant's acts. *E.g., Patusco v. Prince Macaroni, Inc.*, 50 *N.J.* 365, 368, 235 *A.*2d 465 (1967) (injured party should be made whole); *Security Aluminum Window Mfg. Corp. v. Lehman Assoc.*, 108 *N.J.Super.* 137, 141, 260 *A.*2d 248 (App.Div.1970) (same). Defendant contaminated the property, and as a result plaintiff suffered harm. Plaintiff was compelled to relocate, incurring expenses for specialized improvements. While those improvements were being made, plaintiff bore the carrying costs of the new facility. At the same time State laws barred the sale of the contaminated site. See *supra* at 380. Thus, plaintiff incurred and will continue to incur maintenance expenses for that site until the time of cleanup. All of those losses flowed from defendant's inappropriate disposal of radioactive waste, and all should be considered on remand.

Plaintiff should not, however, be allowed to present a claim for the value of its president's time and services in addressing the contamination problem rather than in handling usual concerns of the corporation. That time does not represent a corporate loss. The president of T & E, like presidents of all companies, manages the company. Part of that job

entails handling the numerous problems that face a company each day, and presumably corporate presidents' salaries compensate them for performing not only routine tasks but unanticipated extraordinary ones as well. Because the radon contamination was simply another, albeit uncommonly vexatious, problem facing T & E, the supervision of which was in large measure the duty of its president, plaintiff cannot recover for the value of that service.

In sum, on remand the trial court should consider evidence of those damages, other than the cost of the president's management time, proximately resulting from defendant's disposal of the radium. Those damages awarded by the jury need not be relitigated. That damage award must, however, be modified to accommodate our ruling on the indemnification issue, *i.e.*, the $225,000 award must be reduced by the amount of the diminished value of the contaminated land, $31,500.

## IV

Out of an abundance of caution born of the occasional experience of having our opinions overread, we add a final note about the breadth of our opinion.

By no means do we signal an end to or undermining of that vast body of doctrine by which people regulate their everyday affairs in respect of the conveyancing of land. Today's decision is the proper judicial accommodation of those familiar principles of law to a highly unusual and highly dangerous form of human activity. The law has characterized that activity as "abnormally dangerous." Just as we would not countenance a doctrine of "buyer beware" in the context of fraudulent concealment of infestation of property, *Weintraub v. Krobatsch*, 64 *N.J.* 445, 317 *A.*2d 68 (1974), we do not wholly countenance a doctrine of "buyer beware" in this rare circumstance of demonstrably-tortious conduct that meets the "abnormally-dangerous" definition of tort liability.

Such conduct bespeaks a qualitative judgment about the way such an actor would expect the societal risks posed by that conduct to be borne. We need not decide today whether the abnormally-dangerous activity presented by this case is in any way comparable to that of, say, the operators of a small general store who, in the 1940s, may have sunk a gas tank on their property. A respectable argument could be made that although a statutory regime of cleanup responsibility, as for example under ECRA or the Spill Fund, might extend to them, it does not follow that that statutory responsibility subsumes in any way the "abnormally dangerous" nature of the activity posed by this case—not because the general store operators are "small fry," but because their activity does not meet the *Restatement* criteria, see *supra* at 390–391, particularly factor (d). Their relationships to the intervening title holders may be affected by other principles of law, but not by the principles that apply in this case. We are mindful that what we perceive as a toxic substance today may have been a familiar household commodity in years past.

 Finally, we reflect on the "parade of horribles" argument, namely, that our decision will create such uncertainty as to render it impossible for today's business community to regulate its affairs effectively. We have already noted the limited scope of our holding in that it extends only to that rare form of conduct that meets the criteria of any abnormally-dangerous activity. Second, we note that almost without exception any conveyance of industrial property today would be made not in a vacuum but in full appreciation of regulatory requirements that would surely embrace a condition such as the one on the Alden Street property. *See Dixon Venture v. Joseph Dixon Crucible Co.*, 122 *N.J.* 228, 584 *A.*2d 797 (1991). Parties to such transactions will be able to accommodate themselves to the necessities of the situation. A seller of land dealing in an abnormally-dangerous activity such as the processing of radium can, even under ECRA, *N.J.S.A.* 13:1K–6 to –13, arrange to have the cost of cure shifted to a purchaser and obtain indemni-

fication from such purchaser against any downstream claims. Although the recording of such an agreement might not create a bar to third-party claims, it will surely alter the equities in respect of any claim of benefit-of-the-bargain damages by a successor in the chain.

V

The judgment below is modified and, as modified, affirmed. The cause is remanded for further proceedings consistent with this opinion.

*For modification, affirmance and remandment*—Chief Justice WILENTZ, Justices CLIFFORD, HANDLER, O'HERN and STEIN, and Judges BILDER and A.M. STEIN—7.

*Opposed*—None.