OPINION OF THE COURT
GREENBERG, Circuit Judge.
I. FACTUAL AND PROCEDURAL HISTORY
.This matter is before the court following entry of our order on November 30, 1993, granting defendant-appellant Kerr-McGee Chemical Corporation permission to appeal pursuant to 28 U.S.C. § 1292(b). We will reverse the order of the district court denying Kerr-McGee’s motion for summary judgment entered on September 8, 1993, and we will remand the matter to the district court for entry of a summary judgment in its favor.
The facts are largely not in dispute, and, in any event, we accept the allegations of the plaintiffs-appellees Elaine Leo and Linda Yo-der for purposes of this appeal. From prior to the turn of the 20th century continuing until 1940, the Welsbach Incandescent Light Company maintained and operated a factory *98 in Gloucester City, New Jersey, for manufacturing incandescent gas mantles, a process involving extracting thorium from monazite ores. This process generated toxic wastes consisting of thorium by-products which Welsbach deposited on the factory site, thus contaminating the surrounding land. In 1940, Welsbach’s Illinois-based competitor, Lindsay Light and Chemical Company, purchased Welsbach’s gas mantle business. In the sale, Lindsay acquired Welsbach’s outstanding orders, records, formulas, raw materials, inventory, customer lists, gas mantle production line, and the right to use the ‘Welsbach” name. However, Lindsay did not acquire the Gloucester City land and factory. Rather, it moved the gas mantle business to its own plant in Illinois.
Following a series of acquisitions, Kerr-McGee acquired Lindsay, and it thus concedes that in this litigation it stands in Lindsay’s shoes. Accordingly, we will refer to Lindsay and Kerr-McGee simply as Kerr-McGee. Welsbach owned a second line of business which it sold to Rheem Manufacturing Company but Rheem’s successors, though originally defendants in this action, have been dismissed from the case. Wels-bach was dissolved in 1944.
In 1961, Leo and Yoder, who are sisters, and their parents, Thomas and Catherine Bekes, moved to a home close to the former site of the Welsbach factory in Gloucester City, though Leo and Yoder now live elsewhere. On December 5, 1988, Thomas Bekes died from bladder cancer. In March 1991, the New Jersey Department of Environmental Protection notified Catherine Bekes of the high levels of gamma radiation and thorium on her property and on June 3, 1991, the New Jersey Spill Compensation Fund acquired her residence, forcing her to relocate. Soon thereafter she also died from bladder cancer. Leo and Yoder allege that their parents contracted their bladder cancer from exposure to thorium and other waste substances deposited on the Welsbach land.
On January 29, 1993, Leo and Yoder filed suit, individually, and on behalf of their parents’ estates, in the Superior Court of New Jersey against Kerr-McGee and certain other defendants to recover for death, injuries, and the potential risk of cancer arising from their exposure to thorium and other waste substances generated in the Welsbach gas mantle operation and deposited on the Gloucester City property. As germane here, Leo and Yoder seek to impose liability on Kerr-McGee on a theory of strict liability.[1] While Leo and Yoder do not claim that Kerr-McGee itself generated the waste which caused the deaths and injuries, they assert that it is liable by reason of its acquisition of Welsbach’s gas mantle business. On March 4, 1993, one of the other defendants removed the case to the United States District Court for the District of New Jersey on the basis of diversity of citizenship.
Subsequently, Kerr-McGee filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6) on the ground that the complaint did not state a claim on which relief may be granted inasmuch as Kerr-McGee never has owned the Gloucester City land and factory. In its bench opinion the district court treated the motion as a motion for summary judgment because it considered material other than the complaint submitted on the motion. The court then predicted that the New Jersey Supreme Court would extend the product line doctrine of successor corporate liability, as explicated in Ramirez v. Amsted Indus., Inc., 86 N.J. 332, 431 A.2d 811 (1981), to the toxic tort at issue, because the toxic byproducts were generated directly from the manufacturing of Welsbach’s gas mantles.[2] *99 Thus, the court denied Kerr-McGee’s motion by the order of September 8, 1993. Kerr-McGee then moved for an amendment of the order to allow an interlocutory appeal, and the district court granted the amendment by an order entered on November 1, 1993. We then granted Kerr-McGee leave to appeal.
II. DISCUSSION
We exercise plenary review as the appeal presents an issue of law. Epstein Family Partnership v. Kmart Corp., 13 F.3d 762, 765-66 (3d Cir.1994). Furthermore, we will apply New Jersey law as the parties agree that it is applicable. Thus, we undertake to predict how the Supreme Court of New Jersey would resolve the issues in this case. J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1270-72 (3d Cir.1994).
We start, of course, with Ramirez, 431 A.2d 811, in which the Supreme Court of New Jersey held that:
where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for the injuries caused by defects in the units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.
431 A.2d at 825. As the district court acknowledged, Ramirez is distinguishable from this case. Unlike the injuries in Ramirez, the injuries of Leo, Yoder, and their parents were not caused by a unit in the product line manufactured first by Welsbach and then by Kerr-McGee. Instead the injuries in this ease were caused by conditions created by Welsbach’s operations on land which Wels-bach retained at the time of the sale of the gas mantle business to Kerr-McGee and on which Kerr-McGee never conducted any manufacturing activities. Therefore," we must determine whether in light of these distinctions from Ramirez, the New Jersey Supreme Court nevertheless would apply the result in Ramirez to this ease.[3]
The Ramirez court predicated its conclusion that the successor corporation could be liable for injuries caused by its predecessor’s defective product on three rationales: (1) the sale of the enterprise virtually destroyed the injured party’s remedy against the original manufacturer; (2) the successor has the ability to assume the original manufacturer’s risk-spreading role; and (3) it is fair to require the successor to assume a responsibility for defective products as that responsibility was a burden necessarily attached to the original manufacturer’s good will being enjoyed by the successor in the continued operation of the business. Id. 431 A.2d at 820. Clearly these rationales do not support the extension of successor liability to Kerr-McGee in this case.
The first factor, the destruction of the injured party’s remedy is a necessary but not a sufficient basis on which to place liability on the successor.[4] Accordingly, if the selling corporation remains a viable entity able to respond in damages to the injured party, a successor acquiring a product line will not be hable for injuries caused by the predecessor’s product after the product’s sale *100 as in that circumstance there would be no reason to impose successor liability. Lapollo v. General Elec. Co., 664 F.Supp. 178 (D.N.J.1987) (applying New Jersey law after Ramirez). This initial rationale for the product-line doctrine of successor liability merely focuses on the need for imposition of successor liability rather than whether it is fair to impose it. Therefore, we will not hold that proof that Leo and Yoder cannot recover .against Welsbach because it has been dissolved is in itself a sufficient basis for the imposition of successor liability on Kerr-McGee.
The second rationale on which the Supreme Court of New Jersey based its result in Ramirez was the successor’s ability to assume the predecessor corporation’s risk-spreading role. We think that the Supreme Court of New Jersey would recognize that Kerr-McGee does not have the capacity to assume Welsbach’s risk-spreading role. In this regard, we point out that if successor liability can be imposed for a toxic tort arising from the predecessor’s operations at a facility which the successor never acquires or controls, a prudent manufacturer acquiring a product line would make an analysis of environmental risks associated with the seller’s facilities similar to that now undertaken by purchasers of real estate. The purchaser then would attempt to acquire insurance for possible liabilities associated with the seller’s real estate.
The impediment to commercial transactions from such a process is evident. Indeed, inasmuch as a manufacturer might build a product or its component parts at more than one facility, a purchaser of a product line might face daunting obstacles in attempting to assess its risks of successor toxic tort liability for conditions on property to be retained by the seller of the product line. Furthermore,, a produet-line purchaser not acquiring its predecessor’s manufacturing facility probably would not be able to lessen the risks of toxic tort liability associated with the real estate. It is doubtful that such a product-line purchaser would be able to undertake cleanup operations on land it did not own. Moreover, the product-line purchaser might be unwilling to undertake such potentially costly projects.[5] It seems clear, therefore, that if Ramirez applies here, a purchaser of a product line will be subject to liabilities for toxic torts of unpredictable scope for an indefinite period. Overall, we cannot conceive that the Supreme Court of New Jersey would believe that the purchaser of a product line not acquiring the real estate at which the product was manufactured reasonably could assume its predecessor’s risk spreading role for toxic torts.[6]
In contrast, a successor to a product line may be able to take steps to reduce its risk of liability for injuries caused by the predecessor’s products through recall and educational programs which include those products. Furthermore, successor liability for injuries caused by units manufactured by the predecessor, at least when compared to potential toxic tort liability, is á discrete manageable matter. First, the successor may be able reasonably to anticipate the risks associated with a product it is acquiring. Second, product-line successor liability is applied in cases of the production of personal property. Inasmuch as such property is not likely to have an indefinite useful life, passage of time will diminish the chance of liability being imposed on the successor.
This constant diminution of exposure to product liability is enhanced by the rule followed in New Jersey and elsewhere that a manufacturer cannot be strictly liable unless there was a defect in the product when it left the manufacturer’s control. Scanlon v. General Motors Corp., 65 N.J. 582, 326 A.2d 673, 677 (1974). It seems apparent that, except perhaps in design defect cases, a defect in a product when the manufacturer distributed the product is likely to manifest itself and cause injury within a reasonable time after the product is manufactured. Accordingly, *101 as a practical matter, successor liability under Ramirez is likely to be imposed in most cases, if at all, for a limited period.[7] Furthermore, if there is an injury from a product a long time after it leaves the manufacturer’s hands, the injured plaintiff may have difficulty establishing that the defect existed in the product when manufactured and originally distributed. Thus, using the time scenario here, it would be unusual for the successor in a product line case to be defending an action in the 1990’s for a product that could have been built at the latest in 1940.
On the other hand toxic tort liability can be imposed for activities in the distant past. See T & E Indus., Inc. v. Safety Light Corp., 123 N.J. 371, 587 A.2d 1249 (1991).[8] This tail on potential toxic tort liability following the disposal of chemical wastes is attributable to the fact that the toxic wastes may remain in the ground for long periods, thus exposing persons and property to injury long after manufacturing has ended. Indeed, this ease demonstrates how long the successor can face claims for toxic torts. Furthermore, the difficulty that the purchaser of a product line will have in assessing its risk of liability for toxic torts as compared to its risk of successor product liability is further heightened by the fact that whereas injuries from defective products are likely to be traumatic, and thus be immediately obvious, injury from exposure to toxic wastes may develop over an extended period. We also observe that it would be more likely that the successor could acquire insurance coverage for the discrete risks flowing from injuries caused directly by a predecessor’s product than for environmental risks from conditions on real estate.
The third Ramirez rationale, that it is fair to require a successor to assume a responsibility for defective products as that responsibility is a burden necessarily attached to the successor’s acquisition of the predecessor’s good will, has no application in this case. The good will that Kerr-McGee acquired from Welsbaeh was attached to the product line it acquired, gas mantles, rather than to the site at which Welsbaeh manufactured the product. Thus, Leo and Yoder do not assert that this is a case in which Welsbaeh and Kerr-McGee encouraged the purchasers of the gas mantles to associate them with their geographical source, as, e.g., “a genuine widget manufactured in the widget center of the world.” Consequently, while Leo and Yoder point out that Kerr-McGee’s purchase of the Welsbaeh gas mantle product line was profitable, and they attribute that profit in part to the good will it acquired from Wels-bach, that point is immaterial.
In reaching our result, we quite naturally consider our opinion in City of Philadelphia v. Lead Indus. Ass’n, 994 F.2d 112 (3d Cir.1993). There we indicated that while:
[a] federal court may act as a judicial pioneer when interpreting the United States Constitution and federal law ... [i]n a diversity case, however, federal courts may not engage in judicial activism. Federalism concerns require that we permit state courts to decide whether and to what extent they will expand state common law.... Our role is to apply the current law of the jurisdiction, and leave it undisturbed.
Id. at 123 (internal citations and quotations omitted). We could allow liability to be imposed in this case on Kerr-McGee only if we stretched Ramirez far beyond its original scope and, in light of City of Philadelphia v. Lead Indus. Ass’n, Inc., we will not do that. While the' district court believed that this case could come within the Ramirez holding, in large part it reached that conclusion because of what it thought was “the traditional New Jersey view that if you are injured somebody ought to be liable for it.” But we reject that approach. While we might be willing to apply the precedents of the New Jersey Supreme Court in circumstances somewhat beyond the limits of liability that court has recognized in extant cases, we will not apply Ramirez in the circumstances here, which are far beyond the limits of that case.
In closing, we note that the parties in their briefs discuss cases involving liability of suc *102 cessors acquiring contaminated property and other cases involving liabilities arising from the ownership of and activities on real estate. See, e.g., T & E Indus., Inc. v. Safety Light Corp., 587 A.2d 1249; State of New Jersey, Dep’t of Envtl. Protection v. Ventron Corp., 94 N.J. 473, 468 A.2d 150 (1983). We have examined these cases but do not discuss them, as they have only the most tangential relationship to this case in light of the fact that Kerr-McGee never owned, controlled or engaged in activities on the Gloucester City property.
III. CONCLUSION
We will reverse the order of September 8, 1993, and will remand the matter to the district court for entry of a summary judgment in favor of Kerr-McGee.

. Leo and Yoder also set forth theories of liability predicated on negligence and breach of warranty but we do not discuss them as we find no support for liability on either theory and they do not advance these theories on a basis distinct from the strict liability claim.

. The court also relied on Nieves v. Bruno Sherman Corp., 86 N.J. 361, 431 A.2d 826 (1981), decided on the same day as Ramirez. We, however, have no need to discuss Nieves at length as it merely held that an intermediate successor corporation could be liable under Ramirez even though there is a later viable successor corporation in existence. We note that actions similar to the one in this case are sometimes called “environmental torts” and sometimes called "toxic torts.” As a matter of convenience, we use the latter term as the Supreme Court of New Jersey used that term in T & E Indus., Inc. v. Safety Light Corp., 123 N.J. 371, 587 A.2d 1249, 1251 (1991). Labels, however, are not significant, as *99 we are concerned with the circumstances leading to the attempt to impose liability on Kerr-McGee rather than the characterization of the claim.

. A corporate successor can be liable for its predecessor's debts on theories other than that recognized in Ramirez. For example, liability can be imposed on the successor if it assumes the predecessor’s liabilities or if the predecessor merges into the successor. Ramirez, 431 A.2d at 815. But we confine our opinion to the question of whether Kerr-McGee may be liable based on the product-line doctrine of successor liability as that is the only basis for liability that Leo and Yoder advance against Kerr-McGee.

. Actually, we are not certain that Leo and Yoder effectively do not have a remedy against Wels-bach as they have named U.G.I., formerly known as United Gas Improvement Company, as a defendant on a theory that United Gas dominated Welsbach and therefore U.G.Í. is “legally responsible for the obligations of Welsbach.” , However, Kerr-McGee has briefed the case on the assumption that Leo and Yoder do not have a remedy against Welsbach, and thus we decide the case on that basis.

. In FMC Corp. v. United States Dep’t of Commerce, 29 F.3d 833, 838-39 (3d Cir.1994) (in banc), the government estimated the cost of environmental cleanup of the facility involved in that litigation at between $26,000,000 and $78,000,-000.

. In Ramirez the Supreme Court of New Jersey acknowledged that the negative effect of successor liability in a product liability case on the sale of manufacturing assets was a "legitimate” concern. 431 A.2d at 822. Thus, we think it appropriate for us to consider that effect.

. Of course, the length of the period depends on the type of product involved. For example, machinery might last longer than automobiles.

. We recognize that T & E Indus, is not a personal injury case. Nevertheless we cite the case to demonstrate how it is possible that the consequences of chemical disposal may endure for a very long period.