**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2893-18T2

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
THE COMMISSIONER OF THE
NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
and THE ADMINISTRATOR OF
THE NEW JERSEY SPILL
COMPENSATION FUND,

     Plaintiffs-Appellants,

v.

HESS CORPORATION, f/k/a
AMERADA HESS CORPORATION
and BUCKEYE PARTNERS, LP,

     Defendants-Respondents.

_____

Argued November 4, 2019 – Decided April 7, 2020

Before Judges Rothstadt and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-4579-18.

Allan Kanner (Kanner & Whiteley, LLC) of the Louisiana bar, admitted pro hac vice, argued the cause

for appellant (Gurbir S. Grewal, Attorney General and Allan Kanner, attorneys; Richard F. Engel, Deputy Attorney General, Allan Kanner, Elizabeth B. Petersen (Kanner & Whiteley, LLC) of the Louisiana bar, admitted pro hac vice, and Allison S. Brouk (Kanner & Whiteley, LLC) of the Louisiana bar, admitted pro hac vice, of counsel and on the briefs).

Christopher R. Gibson argued the cause for respondent Hess Corporation, f/k/a Amerada Hess Corporation (Archer & Greiner, PC, attorneys; Christopher R. Gibson, Marc A. Rollo, Patrick M. Flynn and Matthew R. Conley, of counsel and on the brief).

Brendan K. Collins (Ballard Spahr, LLP) of the Pennsylvania bar, admitted pro hac vice, argued the cause for respondent Buckeye Partners, LP (Ballard Spahr, LLP, attorneys; Brendan K. Collins, David A. Haworth and Daniel T. Mullin, on the brief).

PER CURIAM

By leave granted, plaintiffs the New Jersey Department of Environmental Protection (DEP), The Commissioner of the New Jersey Department of Environmental Protection and The Administrator of the New Jersey Spill Compensation Fund, appeal from an order entered December 21, 2018 by the Law Division dismissing under Rule 4:6-2(e), certain counts of their complaint against defendant Hess Corporation f/k/a Amerada Hess Corporation (Hess), and its successor in interest in certain property, defendant Buckeye Partners L.P. (Buckeye). As originally filed, plaintiffs' complaint sought damages arising from

2

the environmental contamination of property that had been historically used as an oil refinery and terminal. Plaintiffs sought relief under the Spill Compensation and Control Act (the Spill Act), N.J.S.A. 58:10-23.11 to -23.24, the Water Pollution Control Act (the WPCA), N.J.S.A. 58:10A-1 to -20, and under New Jersey common law for public nuisance, trespass, and strict liability. The Law Division's order dismissed the complaint to the extent it alleged common law trespass and strict liability, and limited the public nuisance claim to one for injunctive relief only. For the reasons that follow, we affirm in part and reverse in part.

I.

The facts gleaned from the pleadings and motion record are summarized as follows. Hess began operating a refinery in the Port Reading section of Woodbridge Township in 1958. It sold the property to Buckeye in 2013. The facility was and still is used to store and process crude oil and other refined petroleum products.

Plaintiffs' complaint alleged that hazardous materials "discharged" from the refineries during Hess's ownership of the property. Specifically, plaintiffs alleged that a tank failure in October 1969 released 8,000,000 gallons of crude oil affecting the nearby Smith Creek and Arthur Kill, and that additional lesser discharges of oil occurred in 1990 and 1992, followed by a discharge of cat feed, containing

A-2893-18T2

hazardous substances, in 1992. Site investigations confirmed that hazardous substances contaminated the surface water, soil, and groundwater in surrounding areas, including the environmentally sensitive Arthur Kill, Smith Creek, and estuarine and marine wetlands located along the Arthur Kill. In December 1992, in an effort to address the issues caused by the contamination, Hess and plaintiffs entered into a Memorandum of Agreement (MOA) so that plaintiffs could govern Hess's investigations and remedial actions at the site.

Plaintiffs filed their complaint on August 1, 2018, contending that defendants had not acted to assess or restore the injured natural resources. Plaintiffs alleged that the hazardous substances had adversely affected the site's groundwater, surface water, sediment, wetlands, and biota. Plaintiffs sought damages, and declaratory and injunctive relief against Hess and Buckeye.

Count one of plaintiffs' complaint sought restoration of natural resources, as well as damages under the Spill Act, because of the alleged discharge of hazardous substances and pollutants from the refinery. Count two alleged violations of the WPCA for defendants' unauthorized discharge of pollutants and sought damages as well as reimbursement for costs associated with correcting the damage done to the land. Count three alleged public nuisance, as the contamination of the surrounding natural resources constituted a substantial and unreasonable physical invasion of

property. Count four alleged trespass because the contamination constituted an unauthorized physical invasion of property. Finally, count five alleged common law strict liability in that storing and discharging hazardous substances constituted an abnormally dangerous activity.

In response, Hess contended it continued to work with plaintiffs to restore the environment, and that plaintiffs never communicated any dissatisfaction with its remedial efforts. Buckeye contended that hazardous substances contaminated the area before it purchased the property, and that plaintiffs insufficiently alleged that it was responsible for any discharges of hazardous materials.

In October 2018, Hess filed a motion to dismiss plaintiffs' trespass claim, and its public nuisance claim to the extent it claimed monetary rather than injunctive relief. In November 2018, Buckeye filed a motion to dismiss plaintiffs' trespass, public nuisance, and strict liability claims in their entirety. Buckeye also joined in Hess's motion.

The motion judge heard oral argument on December 21, 2018 before issuing his order that day, simultaneously granting defendants' motions and dismissing with prejudice the complaint's trespass and common law strict liability claims as to both Hess and Buckeye, and limiting the remedy for the public nuisance claim to

5

injunctive relief. The judge set forth his reasons in a comprehensive, thoughtful written decision. We later granted plaintiffs' motion for leave to appeal.

II.

On appeal, plaintiffs argue that the motion judge erred by concluding the Spill Act subsumed their common law claims against Hess and Buckeye, that Hess and Buckeye were not engaged in abnormally dangerous activities warranting the application of strict liability, that they could not maintain an action for trespass because the State lacked a sufficient interest in the property, and that their trespass claim should be restored because the State owns the water resources for the State. Finally, plaintiffs contend that the judge improperly limited the remedies available to them under their claim for public nuisance.

"We review a grant of a motion to dismiss a complaint for failure to state a cause of action de novo, applying the same standard under Rule 4:6-2(e) that governed the motion court." Wreden v. Township of Lafayette, 436 N.J. Super. 117, 124 (App. Div. 2014). The standard of our review for dismissal of a complaint under that rule, is whether the pleadings even "suggest[]" a basis for the requested relief. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989); see also Green v. Morgan Props., 215 N.J. 431, 451-52 (2013).

As a reviewing court, we assess only the legal sufficiency of the claim. Sickles v. Cabot Corp., 379 N.J. Super. 100, 106 (App. Div. 2005). Consequently, "[a]t this preliminary stage of the litigation [we are] not concerned with the ability of plaintiffs to prove the allegation contained in the complaint." Printing Mart, 116 N.J. at 746. Rather, we accept the factual allegations as true, Sickles, 379 N.J. Super. at 106, and "search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim," Printing Mart, 116 N.J. at 746 (quoting Di Cristofaro v. Laurel Grove Mem'l Park, 43 N.J. Super. 244, 252 (App. Div. 1957)).

"However, we have also cautioned that legal sufficiency requires allegation of all the facts that the cause of action requires." Cornett v. Johnson & Johnson, 414 N.J. Super. 365, 385 (App. Div. 2010), aff'd as modified, 211 N.J. 362 (2012). In the absence of such allegations, the claim must be dismissed. Ibid.

We conclude from our de novo review of the pleadings that the motion judge incorrectly determined that the Spill Act subsumed plaintiffs' common law claim for strict liability and that, in any event, strict liability was inapplicable because Hess did not maintain an abnormally dangerous activity on the

premises.  In all other aspects, the judge correctly determined that balance of defendants' motions.  We address each issue serially, as argued by plaintiffs.

## The Spill Act Claims

### A.

In granting defendants' applications, the motion judge dismissed the fifth count of plaintiffs' complaint that alleged defendants were strictly liable to plaintiffs for the costs of cleaning up the contaminated area.  In his written decision, the motion judge explained that under the Supreme Court's holding in New Jersey Department of Environmental Protection v. Ventron Corp., 94 N.J. 473, 488 (1983), "those who use . . . land for the conduct of abnormally dangerous activities are strictly liable for resultant damages," regardless of fault. The judge concluded that if "the storage and processing of crude oil and refined petroleum products" constituted an abnormally dangerous activity, plaintiffs' complaint sufficiently stated a cause of action for strict liability.  However, the judge also concluded that under Ventron, those activities were not abnormally dangerous and even if they were, plaintiffs' claims based upon strict liability were "deemed to be subsumed within the Spill . . . Act," "much like common law claims for negligence and implied warranties are deemed subsumed under

the New Jersey Product Liability Act, N.J.S.A. 2A:58C-1 [to -11]." We disagree with these conclusions.

Contrary to the motion judge's view, the Spill Act did not subsume any of plaintiffs' common law claims. The Spill Act specifically preserves all such claims by expressly stating the remedies provided under the Spill Act are in addition to those provided by existing common or statutory law, subject only to a prohibition against double recovery for the same damages or cleanup costs. See N.J.S.A. 58:10-23.11v; see also Ventron, 94 N.J. at 493 (stating the remedies under the Spill Act "are in addition to existing common-law or statutory remedies"). "Spill Act liability does not eliminate common law liability . . . ." N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 420 N.J. Super. 395, 401-02 (App. Div. 2011). The Spill Act permits the DEP to pursue remedies under both the common law and the Spill Act because the Spill Act "establishes new remedies for activities recognized as tortious both under prior statutes and the common law." Ventron, 94 N.J. at 499.

The ability to pursue relief under both the Spill Act and common law was consistent with the Legislature's intention to grant the DEP "broad implied powers" to prevent environmental contamination. N.J. Dep't of Envtl. Prot. v.

A-2893-18T2

Exxon Mobil Corp., 393 N.J. Super. 388, 399 (App. Div. 2007).[1] Under the Spill Act, separate from any common law right, the DEP has a statutory right to hold parties strictly liable if they discharge hazardous materials, along with the ability to pursue alternative common law theories of liability. Ibid.; see also N.J.S.A. 58:10-23.11g(c)(1) (stating violators "shall be strictly liable . . . without regard to fault, for all cleanup and removal costs no matter by whom incurred"); Exxon, 420 N.J. Super. at 397, 407 (reversing dismissal of complaint on statute of limitations grounds and finding that statute did not "foreclose common law causes of action unless the legislative intent specifically provided otherwise"). The common law "remains important in DEP's litigation efforts, especially for filling in any gaps in relief that the statutes may fail to cover." Exxon, 420 N.J. at 402; see also T&E Indus., Inc. v. Safety Light Corp., 123 N.J. 371, 386 (1991) (stating the common law "doctrine of strict liability for abnormally-dangerous activities" ensures that there are no gaps for abnormally dangerous conduct). Consequently, the State's enactment of the Spill Act did not abrogate the

---

[1] The Legislature wanted to protect the State's lands and waters by making the State a trustee of its environmental resources. N.J.S.A. 58:10-23.11a. Part of this pollution included "discharge of petroleum products and other hazardous substances." Ibid. Polluters may be held liable "for damage sustained within this State as a result of any discharge of [hazardous] substances." Ibid.

A-2893-18T2

plaintiffs' right to seek a judgment under the common law holding defendants liable for damages, if any.

B.

Next, we address whether plaintiffs' complaint sufficiently alleged a cause of action for common law strict liability based upon defendants' maintaining an abnormally dangerous condition. The motion judge, citing to the Law Division's opinion in Biniek v. Exxon Mobil Corp., 358 N.J. Super. 587 (Law Div. 2002), which addressed a gas tank vendor's liability for contamination emanating from a single neighborhood gas station, concluded that "[s]ince New Jersey's courts have not found the storage and processing of crude oil and refined petroleum products as an 'abnormally dangerous' activity . . . the . . . claim for strict liability must . . . fail."

We disagree with the motion judge's conclusion and now hold that the storage and processing of petroleum, to the extent allegedly undertaken by Hess on its property, was an abnormally dangerous condition for which strict liability may be imposed. However, as to Buckeye's alleged liability, we agree with the trial judge, that the complaint failed to set forth sufficient facts to maintain an action for strict liability.

11

At the outset, we reject any analogy between Hess's operations and that of a gas station as discussed in <u>Biniek</u>. As the motion judge described in detail, in the present matter, we are dealing with an oil refinery and storage facility that was established in 1958, covered 210 acres adjacent to public waterways, and, at which, over the years, "there have been numerous spills and leaks . . . that caused injuries to . . . natural resources" and exposed people to "hazardous substances and pollutants" that "have been linked to lasting effects on the human central nervous system and respiratory tract, blood disorders, and other serious health conditions." Comparison of the Hess facility to a gas station is therefore totally inapposite for many reasons.

Plaintiffs alleged that defendants stored and discharged various contaminants into the surrounding natural resources. Under a claim of common law strict liability, defendants could only be held accountable without fault if they maintained an abnormally dangerous condition or operation on the premises or allowed others to do so. <u>See</u> <u>Ventron,</u> 94 N.J. at 488 (stating common law strict liability is limited to those who "use[d], or permit[ted] others to use, land for the conduct of abnormally dangerous activities"). In order to determine whether Hess's operations constituted an abnormally dangerous activity, we must apply the test articulated in <u>Ventron</u>.

A-2893-18T2

As the Supreme Court explained in <u>Ventron</u>, which addressed the strict liability of a company that intentionally dumped pollutants into a creek, a court must consider the following factors:

> (a) [the] existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.
>
> [<u>Id.</u> at 491-92 (quoting <u>Restatement (Second) of Torts</u> § 520 (1977).]

In <u>T&E Indust.</u>, our Supreme Court applied the <u>Ventron</u> test and imposed common law strict liability when it found that processing radium constituted an abnormally dangerous activity. 123 N.J. at 394-95. Examining the six factors, the Court found that radium is an "extraordinarily-dangerous substance" whose processing is not a "common activity," especially in an urban setting. <u>Id.</u> at 394. The property which processed the radium was also designated a "Superfund site" because radiation levels exceeded permitted levels and posed a health risk to anyone who entered the premises. <u>Ibid.</u> The Court found that although radium was a useful substance, its utility was outweighed by the danger of processing the substance. <u>Ibid.</u> Therefore, under the Court's holding, the processing of certain substances may allow

13

for common law strict liability if the benefits of producing a substance are outweighed by environmental damage and a threat to the surrounding community.

We conclude that plaintiffs' allegations about Hess's operations sufficiently stated a cause of action for common law strict liability. Hess's operations constituted an abnormally dangerous activity for purposes of maintaining a claim of common law strict liability against Hess. The extent of the operations, its proximity to sensitive waterways and environmental areas, and the danger of the pollutants allegedly used in Hess's operations that were discharged, albeit unintentionally, satisfy the Ventron criteria.

We reach a different conclusion as to Buckeye. Regarding plaintiffs' claim against that entity, the complaint never mentions any activities conducted by Buckeye or anyone else during its ownership that has anything to do with any alleged discharge or contamination. As we already noted, common law strict liability is limited to those who "use[d], or permit[ted] others to use, land for the conduct of abnormally dangerous activities." Ventron, 94 N.J. at 488. In Ventron, the Court did not hold a defendant real estate developer liable because it did not contribute to any contamination. Id. at 493. The same logic applies to Buckeye and

for that reason, the fifth count of the complaint seeking to impose common law strict liability against Buckeye was properly dismissed.[2]

Trespass

The motion judge also dismissed the fourth count of plaintiffs' complaint that asserted a claim of trespass against both defendants. In reaching his decision, the judge adopted the reasoning in an unpublished Law Division opinion, which we reversed on other grounds, see Exxon, 420 N.J. Super. at 395, and in the published cases cited therein, including a federal district court case from the District of New Mexico. According to the judge, under those cases, plaintiffs did "not have an actionable claim or cause of action under the common law theory of trespass with respect to what is alleged here" because the State never held "exclusive possession" of the subject property and any "possessory interest" it held under the public trust doctrine as "trustee, for the benefit of its citizens, of all natural resources within its jurisdiction," was also "non-exclusive, as it would be shared by, among and with the citizens of the State."

---

[2] In their reply brief, plaintiffs contend that Buckeye owned the site in September 2018, when another alleged spill occurred, after plaintiffs filed their complaint. Because that allegation was not part of the complaint, the motion judge did not have an opportunity to consider the claim, and therefore we will not do so now. However, our decision is without prejudice to plaintiffs moving before the trial court to amend their complaint.

Plaintiffs claim that the motion judge erred when he dismissed its trespass claim because the State has ownership rights of water resources under the public trust doctrine. They argue that they hold the water resources as trustees of the State, that they have a parens patriae responsibility to protect its resources, and any pollution of public waters constitutes a trespass. We disagree.[3]

Under New Jersey law, "[a]n action for trespass arises upon the unauthorized entry onto another's property, real or personal." Pinkowski v. Township of Montclair, 299 N.J. Super. 557, 571 (App. Div. 1997). A trespass requires that the invasion be to land that is in the exclusive possession of the plaintiff. Ventron, 94 N.J. at 488-89.

Land in the public trust is held by the State on behalf of a second party, the people.[4] Ibid. Such land cannot be in "exclusive possession" of the State

---

[3] Plaintiffs' parens patriae argument was not raised before the motion judge. For that reason, we do not consider it on appeal. See Correa v. Grossi, 458 N.J. Super. 571, 576 n.2 (App. Div. 2019); State v. Robinson, 200 N.J. 1, 20 (2009) (quoting Nieder v. Royal Indem. Ins., 62 N.J. 229, 234 (1973)) ("[A]ppellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.").

[4] The doctrine has been applied to ensure public access to beach areas. Township of Neptune v. N.J. Dep't of Envtl. Prot., 425 N.J. Super. 422, 439 (App. Div. 2012). It is applied to ensure the public's "reasonable access to the

as the interest created by the doctrine is intended to ensure that others have use of the same land. It does not grant to the State the exclusive possession of property.

Applying these principles, we conclude the motion judge here correctly dismissed the fourth count of plaintiffs' complaint.

### Public Nuisance

In his order, the motion judge dismissed the third count of plaintiffs' complaint "insofar as [it] seeks damages in the form of <u>monetary relief</u> other than the injunctive remedy of abatement." (Emphasis added). In reaching his decision, the judge cited to the Court's holding in <u>In re Lead Paint Litigation</u>, 191 N.J. 405 (2007), and concluded that the only available remedy to the State was that of abatement. The judge rejected plaintiffs' contention that abatement included "restoration of the disaffected or damage[d] natural resources" "at the expense of" defendants. Quoting from <u>Lead Paint</u>, the judge held that "[t]he

---

sea." <u>Ibid.</u>; <u>Matthews v. Bay Head Improvement Ass'n</u>, 95 N.J. 306, 324 (1984); <u>see also</u> <u>Raleigh Ave. Beach Ass'n v. Atlantis Beach Club, Inc.</u>, 185 N.J. 40, 63 (2005) (Wallace, J., dissenting) ("We have interpreted the public trust doctrine to require broad public access to those lands that are held in public trust."). There are no cases applying the doctrine to create an exclusive possessory interest in any land or waterways.

A-2893-18T2

only basis for a money damage remedy arises in the context of a private action [as compared to an action by the State] for public nuisance."

Plaintiffs argue on appeal that the motion judge erred by limiting their possible relief for public nuisance to injunctive relief. They do not challenge the motion judge's determination that they are not entitled to seek typical tort damages arising from Hess's operations creating a public nuisance, such as loss in value of property, that could be available to a private plaintiff who suffered special injuries. Rather, they contend that the judge's order prematurely foreclosed them from recovering any "monetary relief," which could include the cost of abatement. To the extent the judge's order can be read in that manner, we agree.

Public nuisance is "an unreasonable interference with a right common to the general public." Id. at 425 (quoting Restatement (Second) of Torts § 821B (1979)). As detailed in Lead Paint, actions for public nuisance can be brought by both private citizens and public entities, but the available remedies are different for the two. Public entities cannot seek monetary relief for public nuisance because "a public entity which proceeds against the one in control of [a] nuisance may only seek to abate, at the expense of the one in control of the nuisance." Id. at 429 (emphasis added). As the Court explained in Lead Paint, public entities do not have a right,

"either historically, or through the Restatement (Second) . . . to seek to collect money damages in general. Rather, there is only a private plaintiff's right to recover damages through an action arising from a special injury."[5] Id. at 428-29 (citation omitted). Although a public entity's right to seek abatement "include[s] the right to visit upon the owner of the land from which the public nuisance emanates, [as well as] the obligations, including the costs, of the abatement . . . [it cannot] seek to collect money damages in general." Id. at 428; see also City of Paterson v. Fargo Realty

---

5 The damages a private party can recover for trespass or nuisance are

> (a) the difference between the value of the land before the harm and the value after the harm, or at [plaintiff's] election in an appropriate case, the cost of restoration that has been or may be reasonably incurred;
>
> (b) the loss of use of the land, and
>
> (c) discomfort and annoyance to him as occupant.
>
> [Ayers v. Township of Jackson, 106 N.J. 557, 571 (1987) (quoting Restatement (Second) of Torts § 929(1) (Am. Law Inst. 1979)); see also Kornbleuth v. Westover, __ N.J. __, __ (2020) (slip op. at 13-14).]

Such damages may include "natural resource damages [that] are viewed as the difference between the natural resource in its pristine condition and the natural resource after the cleanup, together with the lost use value and the costs of assessment." Exxon, 420 N.J. Super. at 410 (quoting Utah v. Kennecott Corp., 801 F. Supp. 553, 568 (D. Utah 1992)).

<u>Inc.</u>, 174 N.J. Super. 178, 185 (App. Div. 1980) ("It has long been recognized that a right to reimbursement will accrue to a municipality for its expenses in rightfully demolishing a building constituting a public nuisance.").

Here, then, we affirm the motion judge's dismissal of plaintiffs' claim in the third count of their complaint for damages, but restore their ability to otherwise seek "monetary relief" associated with any judgment ordering abatement of a public nuisance, if plaintiffs succeed on their claim.

### III.

In sum, we remand so the order under appeal can be clarified to state that the dismissal of plaintiffs' claim for "monetary relief" in the third count of the complaint does not encompass costs of abatement. We affirm the dismissal of the fourth count asserting trespass, and we reverse the dismissal of the fifth count asserting common law strict liability against Hess.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.[6]

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6] Our holding is without prejudice to a party seeking leave from the trial court to amend their pleadings to assert additional claims or defenses not previously set forth in their original filings.

A-2893-18T2